Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>v.<br><br><br>BERNARDO LLAMA DÍAZ<br><br>Apelante | KLAN202301052 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso número: ISCR202200262, ISCR202200263 ISCR202200264 ISCR202200265 ISCR202200266 ISCR202200267<br><br>Sobre: Tentativa Art. 93A C.P., Art., 244 C.P., Art. 6.08 Ley 168, Art. 6.09 Ley 168, Art. 6.11 Ley 168 (2 cargos) |

Panel integrado por su presidente, el juez Adames Soto, la juez Aldebol Mora y el juez Pérez Ocasio.[1]

# SENTENCIA

En San Juan, Puerto Rico, a 21 de noviembre de 2025.

Comparece Bernardo Llama Díaz y solicita la revocación de la *Sentencia* de setenta y tres (73) años de reclusión que le fue impuesta por el foro primario el 3 de noviembre de 2023, así como del veredicto unánime de culpabilidad emitido el 3 de octubre de 2023, ante el Tribunal de Primera Instancia, Sala de Mayagüez, en los casos con designación alfanumérica ISCR202200262-0267. Los cargos que pesaban contra el apelante y por los que fue hallado culpable son los siguientes: Tentativa al Artículo 93 del Código Penal de 2012, *infra*, sobre asesinato; infracción al Artículo 244 del Código Penal de 2012, *infra*, sobre conspiración y violaciones a los artículos 6.08 (posesión de armas de fuego sin licencia), 6.09 (portación,

---

[1] Mediante la Orden Administrativa OATA-2025-070 de 9 de mayo de 2025, se designó al Hon. Alberto L. Pérez Ocasio para entender y votar en el caso de epígrafe, en sustitución del Hon. Abelardo Bermúdez Torres.

posesión o uso ilegal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado) y 6.11 (facilitación de armas a terceros) de la *Ley de Armas de Puerto Rico de 2020*, infra.

Por los fundamentos que expondremos a continuación, confirmamos la *Sentencia* apelada.

**I**

Por hechos ocurridos el 3 de agosto de 2021, Bernardo Llama Díaz (Llama Díaz o el apelante) fue acusado por tentativa de infracción al Artículo 93(A) (asesinato) y violación al Artículo 244 (conspiración) del Código Penal de 2012, 33 LPRA secs. 5142(A) y 5334. Asimismo, fue acusado por infracciones a los Artículos 6.08 (posesión de armas de fuego sin licencia), 6.09 (portación, posesión o uso ilegal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado) y 6.11 (facilitación de armas a terceros) de la *Ley de Armas de Puerto Rico de 2020*, Ley Núm. 168-2019, según enmendada, 25 LPRA secs. 466g, 466h y 466j.

En específico, el Ministerio Público le imputó al apelante, conspirar con Gustavo A. González González (González González), José Manuel Rodríguez Torres (Rodríguez Torres) y Rodney Antonio Santiago Ramírez (Santiago Ramírez) para asesinar a su hermano, Andrés Llama Díaz, a cambio de dinero. Asimismo, le imputó a Llama Díaz transferir armas de fuego con intención criminal e incurrir en tentativa de asesinato en contra de Andrés Llama Díaz.

El 7 de marzo de 2022, se celebró la *Vista Preliminar*. Consecuentemente, el 18 de marzo de 2022, se llevó a cabo la correspondiente lectura de acusación. Ulteriormente, el peticionario solicitó que el juicio fuera por Jurado.

El juicio ante Jurado comenzó el 21 de junio de 2023, con el juramento final del Jurado. Tras varios incidentes procesales, el 28 de agosto de 2023, el apelante presentó ante el foro primario una *Moción Urgente en Solicitud de Orden al Amparo de la Regla 95 y de*

*lo Resuelto en Pueblo* v. *Casanova,* 161 DPR 183 (2004) y *Pueblo v. Velázquez Colón,* 174 DPR 304 (2008). Allí, sostuvo que existía evidencia que nunca se le había entregado y que esta era relevante para su defensa. Alegó que, si bien el Ministerio Público le había entregado cierta evidencia que pretendía utilizar en el juicio, existía otra evidencia que nunca se le había entregado y era relevante para la defensa. En vista de ello, solicitó un listado de información que catalogó como pertinente y que no se le había entregado, lo cual adujo que promovía la violación al debido proceso de ley.

El mismo día, Llama Díaz sometió una *Moción Urgente en Solicitud de Juicio por Separado y en Solicitud de Vista Argumentativa.* Indicó que el Estado había mantenido unido el procedimiento criminal de este junto al coacusado Rodríguez Torres, quien evadió la jurisdicción del foro primario. Por tanto, el caso contra este último se ventilaría por Jurado en su ausencia. Planteó que el procesamiento simultáneo de dos coacusados —uno en presencia y otro en ausencia— operaría en contra de sus intereses y proveería una ventaja indebida al Estado al ocasionar un perjuicio adicional en su contra. En lo pertinente, sostuvo que una instrucción del tribunal al Jurado a tales efectos sería insuficiente y no impediría el perjuicio, por lo que solicitó un juicio por separado.

Posteriormente, el 30 de agosto de 2023, Llama Díaz instó una *Moción Solicitando Supresión de Evidencia,* mediante la cual objetó la admisión de toda la evidencia material y testimonial obtenida en virtud de una orden de registro y allanamiento en su contra. Adujo que dicho registro y allanamiento era inválido, ilegal e irrazonable, toda vez que la orden adolecía de especificidad y la información que daba base a la obtención de esta era incorrecta. Además, planteó que el diligenciamiento fue posterior al término estatutario establecido en las Reglas de Procedimiento Criminal. Argumentó igualmente que la prueba con la que contaba el Ministerio Público

para establecer las alegaciones de la acusación era producto de un registro ilegal. A su vez, sostuvo que existían controversias que ameritaban la celebración de una vista.

Evaluadas las referidas mociones, el 5 de septiembre de 2023, el foro primario emitió y notificó una *Resolución*, mediante la cual declaró *No Ha Lugar* las tres mociones promovidas por el apelante. En el referido dictamen interlocutorio, en cuanto a la moción al amparo de la Regla 95 de Procedimiento Criminal, 34 LPRA Ap. II, R. 95, el foro primario concluyó que dicho petitorio no se solicitó previo al comienzo del juicio, el cual había iniciado desde que el Jurado fue juramentado definitivamente, según la normativa de *Pueblo v. Paonesa Arroyo*, 173 DPR 203 (2008). Indicó que el descubrimiento de prueba debía culminar diez (10) días antes de comenzar el juicio en su fondo, por lo que dicha solicitud estaba fuera de lo dispuesto en la citada regla. Además, señaló que resultaba claro que la defensa siempre expresó que el Ministerio Público cumplió con el descubrimiento de prueba y se encontraba conforme con este.

De igual forma, el foro primario determinó que tampoco procedía el petitorio sobre juicio por separado bajo la Regla 93 de Procedimiento Criminal, 34 LPRA Ap. II, R. 93, toda vez que era improcedente y tardío, pues la parte peticionaria lo presentó cuando el juicio había comenzado. Particularizó que, conforme a la citada regla, dicha moción se tenía que hacer antes de ser llamado el caso a juicio, específicamente con no menos de veinte (20) días de antelación a este.

Referente a la moción de supresión de evidencia, el foro *a quo* expresó que esta no fue radicada dentro de los cinco (5) días previos al comienzo del juicio. Indicó que el juicio ante Jurado comenzó el 21 de junio de 2023, con el juramento final del Jurado, lectura de las acusaciones y las instrucciones preliminares. Detalló que el

descubrimiento de prueba, conforme a la propia defensa, había culminado hacía meses y esta última estaba preparada para juicio. Abundó que la defensa se había reunido con el Ministerio Público y había alcanzado la estipulación de la evidencia. Especificó que, en la vista del 1 de septiembre de 2023, la defensa solicitó la supresión de la evidencia que se marcara como *Exhibit #51*.

Sobre lo anterior, el foro primario determinó que, ante la petición presentada por la defensa y en aras de la pureza del proceso ante Jurado, escucharía en corte abierta las expresiones de las partes en cuanto a la evidencia a ser presentada por estipulación. Expresó que se determinaría la procedencia de la Regla 109 de Evidencia de Puerto Rico de 2009, 32 LPRA Ap. VI, R. 109, en cuanto a la pieza evidenciaria que la defensa alegó no fue estipulada. Por otro lado, le ordenó al Ministerio Público a comparecer preparado respecto a los testigos que serían utilizados en la vista señalada para el 6 de septiembre de 2023, a las 9:00 a.m.

En desacuerdo con dicha determinación, el 6 de septiembre de 2023, el apelante presentó ante nos un recurso de *certiorari*, en el caso con designación alfanumérica KLCE202300977. Mediante *Resolución* del 8 de septiembre de 2023, este Foro denegó la expedición del auto solicitado.

Luego de comenzado el juicio el 21 de junio de 2023 con el juramento al Jurado, así como con posterioridad al incidente procesal en el caso KLCE202300977, el desfile de la prueba de cargo comenzó durante la vista celebrada el 7 de septiembre de 2023 y consistió en varios testimonios. A continuación, ofrecemos un resumen de los testimonios relevantes vertidos en el juicio que nos ocupa y que hemos examinado con detenimiento.

**Prueba oral desfilada en la vista celebrada el 7 y 8 de septiembre de 2023:**

**<u>Testimonio de Andrés Llama Díaz (víctima):</u>**

Andrés Llama Díaz afirmó que desde el 2008 es el presidente de la empresa Elmec Industries, ubicada en la calle Comercio en Mayagüez.[2] El testigo declaró que el 3 de agosto de 2021 vivía en el Condominio Torre de Marsella en la Carretera 102 en Joyuda; que usaba una Dodge RAM 25000, del 2018, color blanca; que su horario de trabajo era de 8:00 a.m. a 5:00 p.m., y que la ruta hacia el trabajo y de regreso a su casa era la misma, por la Calle Comercio que se convierte en Guanajibo de Joyuda.[3] Sobre el apelante, el testigo expresó que es su hermano, al cual identificó en sala.[4] Destacó que, para el día de los hechos, su hermano vivía en la Carretera 100, kilómetro 2.8 en el Barrio Cerrillo.[5]

Sobre el día de los hechos, Andrés Llama Díaz mencionó que ese día salió de su casa entre las 7:00 y 8:00 a.m., en dirección a su trabajo en la RAM blanca; que condujo por la Carretera 102 llegando a Mayagüez; que llevó a cabo sus labores en Flan-es-Cedó; que salió aproximadamente a las 6:30 p.m., tomó la misma ruta por la Carretera 102, en dirección hacia su apartamento, pero que antes se detuvo en el negocio Asia Italy antes de llegar al puente de Guanajibo y que allí ordenó comida y se quedó hablando con el dueño del negocio en el cual estuvo alrededor de una hora, por lo que salió de allí entre 7:30 y 8:00 p.m.[6] El testigo afirmó que, al llegar a Torre de Marsella, tuvo que frenar por completo y esperar a que abriera el portón. Asimismo, que mientras esperaba fue atacado a balas y recibió más de veinte (20) balas y que fue impactado con seis (6) o siete (7) tiros.[7] Andrés Llama Díaz declaró que recibió dos (2) disparos en la cabeza y cuatro (4) en la espalda y muchos fragmentos, pero que no observó a ninguna persona, ni a ningún vehículo; que perdió la conciencia y que, al quedar inconsciente, parece que soltó el freno e impactó el poste del portón, que despertó, puso el carro en reversa y volvió a quedar inconsciente.[8]

Durante su testimonio, Andrés Llama Díaz añadió que, para la fecha de los hechos, la relación con su hermano, Bernardo Llama Díaz no era muy buena; que en el trabajo el apelante le exigía y amenazaba verbal y físicamente; que este le exigía y que lo amenazaba que, si no cumplía, que las pagaba con sangre; que en una ocasión le tiró el escritorio encima y que las amenazas ocurrían si el testigo no le daba dinero.[9]

Asimismo, el testigo declaró que, como consecuencia de los impactos de bala recibidos, tuvo los siguientes daños: impacto en mandíbula, pérdida de hueso y de cinco dientes, maxilar fracturado en la parte del frente de la cara, bala alojada en el sistema auditivo, cuatro impactos de bala en la espalda, escápulas fracturadas, problemas de digestión por

---

[2] *Véase* pág. 48 de la TPO de la vista del 7 de septiembre de 2023.
[3] *Íd.*, págs. 148-149 de la TPO de la vista del 7 de septiembre de 2023.
[4] *Íd.*, pág. 149, líneas 14-25, de la TPO de la vista del 7 de septiembre de 2023.
[5] *Íd.*, págs. 150 y 152 de la TPO de la vista del 7 de septiembre de 2023.
[6] *Íd.*, págs. 153-156 de la TPO de la vista del 7 de septiembre de 2023.
[7] *Íd.*, págs. 157-159 de la TPO de la vista del 7 de septiembre de 2023.
[8] *Íd.*, págs. 158-160 de la TPO de la vista del 7 de septiembre de 2023.
[9] *Íd.*, págs. 160-162 de la TPO de la vista del 7 de septiembre de 2023.

no poder comer, trauma en los hombros, trauma en el ojo, cráneo y huesos fracturados.[10]

Durante el contrainterrogatorio, Andrés Llama Díaz afirmó que está a cargo del activo principal de las empresas Cedó, que queda a cuatro (4) o cinco (5) millas de su residencia; que trabaja allí desde el 2008; que quedó a cargo de la empresa a partir del 2011, cuando falleció su padre y que el asunto de la herencia de su padre puede ser lo que ocasionó los problemas entre él y su hermano.[11] Afirmó, además, que le dijo al agente investigador de las amenazas de muerte del apelante y del temor que sentía por su vida respecto a su hermano, pero que no recordaba exactamente cuándo se lo dijo.[12] Expresó, además, que no conocía a Rodríguez Torres, ni lo había visto y que el día de los hechos no percibió que lo estuvieran siguiendo.[13]

El testigo expresó que el residencial más cercano a la empresa colinda por la parte de atrás con las instalaciones de la empresa y que cuando hizo las declaraciones juradas en ningún momento se le preguntó por las órdenes de protección y que estas fueron en contra del apelante.[14]

### Testimonio del Agte. Denis Méndez Rodríguez (agente Méndez Rodríguez):

En esencia, el testigo declaró que trabaja para el Negociado de la Policía de Puerto Rico (NPPR) desde el 2011 y que desde el 2017 labora en la División de Crímenes Cibernéticos del Área de Mayagüez. Referente al *Exhibit* #40, el testigo afirmó que era un consentimiento de registro de un teléfono en el cual la persona entrega voluntariamente un dispositivo para ser examinado.[15]

Señaló que Gustavo A. González González (González González) dio el consentimiento y lo entregó al agente; que al dispositivo se le hizo una extracción forense y que, al culminar la extracción, el teléfono se entregó, porque fue mediante consentimiento.[16] El testigo declaró que el Agte. José L. Acevedo Olivencia (agente Acevedo Olivencia) le hizo una solicitud de un trabajo anterior que había hecho porque había una evidencia que necesitaba para su caso y que él le dijo que necesitaba autorización de la fiscalía.[17] Expresó que, una vez recibió esa autorización de la fiscalía, procedió a verificar el *pendrive* que se le entregó al agente del caso anterior para identificar la evidencia que este necesitaba.[18] Afirmó que abrió el servidor de su computadora, verificó la información solicitada, lo trasladó a su computadora y se lo entregó al agente en DVD-R.[19] El testigo expresó que, según solicitado por el agente investigador en el DVD entregado, habían diez fotos y tres videos y que el *Exhibit* #43, informe forense identificado como PPR613.4, contiene toda esa información y su firma.[20] Identificó el DVD al mostrársele el *Exhibit* #44, lo

---

[10] *Íd.*, pág. 68 de la TPO de la vista del 7 de septiembre de 2023.
[11] *Íd.*, págs. 173-176 de la TPO de la vista del 7 de septiembre de 2023.
[12] *Íd.*, pág.184 de la TPO de la vista del 7 de septiembre de 2023.
[13] *Íd.*, págs. 202-204 de la TPO de la vista del 7 de septiembre de 2023.
[14] *Íd.*, págs. 207-208 de la TPO de la vista del 7 de septiembre de 2023.
[15] *Véase* págs. 22-23 y pág. 34 de la TPO de la vista del 8 de septiembre 2023.
[16] *Íd.*, págs. 34-35 de la TPO de la vista del 8 de septiembre 2023.
[17] *Íd.*, pág. 38 de la TPO de la vista del 8 de septiembre de 2023.
[18] *Íd.*, págs. 38-39 de la TPO de la vista del 8 de septiembre de 2023.
[19] *Íd.*, pág. 39 de la TPO de la vista del 8 de septiembre de 2023.
[20] *Íd.*, págs. 40-41 de la TPO de la vista del 8 de septiembre de 2023.

revisó e indicó que contenía lo que extrajo del teléfono.[21] Al ser contrainterrogado por la defensa del apelante, el testigo afirmó que se limitó a buscar la información solicitada por el agente investigador en el servidor de la Policía de Puerto Rico, el cual se encuentra en el formato *Cellebrite* y que hizo una extracción completa del teléfono de González González.[22] El testigo expresó además, que se limitó a extraer la información solicitada y que no realizó ningún análisis.[23]

El agente Méndez Rodríguez declaró que el informe forense revelaba que la primera foto había sido creada por el teléfono y que el 7 de agosto aparece como la fecha en que dicha foto se tomó.[24] Expresó, además, que surge la fecha en que se tomaron las fotos 2, 3 y 4 y que la foto número 3 fue creada en el teléfono el 2 de agosto de 2021.[25] Asimismo, afirmó que la foto número 5 llegó al teléfono el 11 de agosto vía WhatsApp y que las fotos de la cinco (5) a la diez (10) no tienen fecha.[26] Sobre el video, uno el testigo declaró que este fue enviado por WhatsApp el 7 de agosto de 2021 y que el segundo video no fue creado por el equipo, que estaba en el dispositivo desde el 7 de agosto; que el tercer video estaba en el equipo desde el 3 de agosto y que el agente Acevedo Olivencia no le solicitó que identificara de donde provenía la foto.[27] Con respecto a la foto número uno, el testigo declaró en el redirecto que esta foto se encontraba en el dispositivo para el 7 de agosto y que conforme a la metadata de la foto se trataba de un *thumbnail,* que no es la foto original como tal dentro del dispositivo, sino un *preview* de la foto original.[28] Finalmente, el testigo afirmó que su conclusión era que la foto había sido borrada del dispositivo; que lo que pudo traer el programa fue ese *thumbnail* y que la foto se encontraba en la carpeta donde se toman fotografías del teléfono.[29]

### Testimonio del Agente Luis Pérez Badillo (agente Pérez Badillo):

Declaró que trabaja para el NPPR desde hace treinta (30) años y que el 3 de agosto se encontraba patrullando por el área de Joyuda, Carretera 102 alrededor de las 8:30 p.m., cuando recibió una llamada del distrito de Cabo Rojo en la que le informaron que por el sistema de emergencias 9-1-1 se había reportado un herido de bala en el kilómetro 10.4, frente al Edificio Torre Marsella; que llegó al lugar de los hechos y que se encontró con un herido de bala en el interior de una Dodge Ram color blanca.[30] El testigo sostuvo que el vehículo esperaba a que abriera el portón eléctrico para entrar al estacionamiento privado.[31]

El agente Pérez Badillo expresó que al llegar a la escena verificaron todo y vieron que la persona todavía estaba respirando; que la víctima estaba dentro del vehículo, detrás del guía, conduciendo y que uno de los conocidos de la víctima

---

[21] *Íd.*, págs. 43-45 de la TPO de la vista del 8 de septiembre de 2023.
[22] *Íd.*, págs. 66-67 y 71-72 de la TPO de la vista del 8 de septiembre de 2023.
[23] *Íd.*, pág. 77 de la TPO de la vista del 8 de septiembre de 2023.
[24] *Íd.*, pág. 89 de la TPO de la vista del 8 de septiembre de 2023.
[25] *Íd.,* págs. 89-90 de la TPO de la vista del 8 de septiembre de 2023.
[26] *Íd.*, págs. 94-95 de la TPO de la vista del 8 de septiembre de 2023.
[27] *Íd.*, pág. 95 y pág. 111 de la TPO de la vista del 8 de septiembre de 2023.
[28] *Íd.*, pág. 111-112 de la TPO de la vista del 8 de septiembre de 2023.
[29] *Íd.*, págs. 112-113 de la TPO de la vista del 8 de septiembre de 2023.
[30] *Íd.*, págs. 123-126 de la TPO de la vista del 8 de septiembre de 2023.
[31] *Íd.*, pág. 126 de la TPO de la vista del 8 de septiembre de 2023.

tomó la iniciativa de montarlo en un vehículo privado y transportarlo al hospital.[32] El testigo explicó que observó que la víctima tenía varias heridas en todo el costado izquierdo, en la cara, el cuello, hombros, brazos; que el vehículo tenía impactos de bala en el cristal y la carrocería y que los impactos de bala estaban en el lado izquierdo, desde el lado del conductor.[33] Afirmó que corroboró la información; que para fines de la investigación mantuvo el área segura, para que no fuera alterada y que informó a la División de Homicidios y Servicios Técnicos, a quienes les correspondía investigar.[34] Indicó que el agente Acevedo Olivencia de Homicidios, fue el que investigó la escena junto al Agte. Samuel Nieves Hernández, de la División de Servicios Técnicos y que, mientras estos llegaban, custodió la escena y recopiló información de la víctima y de los testigos.[35]

El testigo declaró que verificó el tipo de arma o cartucho de arma que se utilizó; que observó casquillos de balas al lado del conductor del vehículo y que el lugar era bastante claro.[36] Expresó que la víctima no estaba en condiciones de ser entrevistado porque se encontraba gravemente herido y que el portón del edificio se encontraba abierto porque el vehículo continuó la marcha e impactó la verja.[37]

### Vista de 11 de septiembre de 2023

#### Testimonio del Dr. Norberto García (doctor García):

Tras calificarse como perito, el testigo, quien es médico de Emergencias, declaró que el 3 de agosto de 2021, mientras trabajaba en el Centro Médico de Mayagüez, fue notificado que había llegado un paciente con heridas que aparentaban ser de arma de fuego.[38] Relató que fue al área de trauma y que el paciente estaba en silla de ruedas cubierto de sangre; que lo movieron a una camilla y, debido al tipo de lesión que tenía, procedió a intubarlo y a realizarle estudios de imagen y laboratorio.[39] El testigo declaró que la víctima tenía lesiones en el área maxilofacial, ausencia de dientes incisivos, sangrado por la parte de atrás, en la parte posterior del cuello y el trapecio; que tenía como si fueran orificios de arma de fuego y abrasiones por causa de otro objeto, así como múltiples lesiones y, entre ellas, parecía tener heridas de arma de fuego.[40]

El doctor García narró, además, que el paciente tenía cerca de la nariz un orificio, que le faltaban los dientes de al frente y otros colgaban; que el sangrado en el área de la boca era profuso, por lo cual lo entubaron; porque estaba tragando sangre y así evitaban que la sangre le llegara a los pulmones.[41] Atestiguó que se manejaron las heridas, se le dio antibiótico, que debido al sangrado se le monitoreó la hemoglobina y se le hizo un CT, que reveló que tenía heridas de armas de fuego; que se observó el trayecto y que difícilmente un proyectil que

---

[32] *Id.*, pág. 127 de la TPO de la vista del 8 de septiembre de 2023.
[33] *Íd.*, págs. 127-128 de la TPO de la vista del 8 de septiembre de 2023.
[34] *Íd.*, pág. 128 de la TPO de la vista del 8 de septiembre de 2023.
[35] *Íd.*, págs. 128-129 de la TPO de la vista del 8 de septiembre de 2023.
[36] *Íd.*, págs. 128-130 de la TPO de la vista del 8 de septiembre de 2023.
[37] *Íd.*, págs. 130-133 de la TPO de la vista del 8 de septiembre de 2023.
[38] *Véase* págs. 47 y 49 de la TPO de la vista del 11 de septiembre de 2023.
[39] *Íd.*, pág. 50 de la TPO de la vista del 11 de septiembre de 2023.
[40] *Íd.*
[41] *Íd.*, págs. 51-52 de la TPO de la vista del 11 de septiembre de 2023.

no haya sido de alta potencia atravesaría la cara completa del paciente. Por tanto, lo refirió al Centro Médico de Río Piedras.[42] El testigo agregó que el proyectil atravesó el maxilofacial, la base del cráneo completa y se alojó en la parte posterior.[43] Al ser contrainterrogado, el testigo manifestó que, según las imágenes, había una trayectoria que atravesaba la parte frontal de la cara, hasta la parte posterior de la cabeza y pasaba por toda la base del cráneo, lo que aparentaba ser un orificio de entrada cerca de la cara, debajo de la nariz y la boca y, que según las imágenes, no tenía salida.[44]

### Testimonio de la Agte. Yaritza Vargas González (agente Vargas González):

La agente Vargas González afirmó que desde el 2000 trabaja como agente de la Policía de Puerto Rico y que para agosto de 2021 trabajaba en la División de Registro de Armas de Mayagüez, donde se encargaba de la expedición de armas de fuego.[45] La testigo declaró que el agente Acevedo Olivencia le solicitó información sobre si la persona posee un arma de fuego o si el arma involucrada en el delito estaba inscrita. Agregó que se expidió una certificación negativa de licencia de armas para el número de seguro social que proveyó el referido agente, el cual pertenecía a Rodríguez Torres.[46] La testigo explicó que, al buscar en el sistema Real con el nombre de José Manuel Rodríguez, el sistema arrojó que este no tenía licencia de armas.[47]

### Testimonio del Agte. Héctor Sánchez Hernández (agente Sánchez Hernández):

El testigo declaró que trabaja en el NPPR hace veintitrés (23) años; que trabaja en la División de Licencias de Armas en el área de Mayagüez desde hace ocho años; que tiene varias funciones, entre las que se destacan: recibir y renovar licencia de armas, y expedir certificaciones.[48] Sobre el *Exhibit* #26, el cual se le mostró, el testigo afirmó que este refleja que se hizo una búsqueda bajo determinado número de seguro social y que el sistema reflejó que no posee licencia de armas y que, al buscar bajo el nombre de Bernardo Llama Díaz, el sistema mostró que no tiene licencia de armas y que ambos documentos los preparó el 24 de agosto de 2021.[49]

### Testimonio del Agte. Waldemar Ramírez Rodríguez (agente Ramírez Rodríguez):

El testigo declaró que desde el 1999 se desempeña como agente del NPPR y que, desde el 2015, trabaja para la División de Arrestos Especiales; que tiene bastante experiencia ocupando armas y que se encarga de investigar órdenes de

---

[42] *Íd.*, págs. 52-53 de la TPO de la vista del 11 de septiembre de 2023.
[43] *Íd.*, págs. 53-54 de la TPO de la vista del 11 de septiembre de 2023.
[44] *Íd.*, págs. 154-155 de la TPO de la vista del 11 de septiembre de 2023.
[45] *Íd.*, págs. 57-58 de la TPO de la vista del 11 de septiembre de 2023.
[46] *Íd.*, pág. 60 de la TPO de la vista del 11 de septiembre de 2023. Se le mostró, además, el *Exhibit* #24, el cual identificó.
[47] *Íd.*, págs. 162-163 de la TPO de la vista del 11 de septiembre de 2023.
[48] *Íd.*, págs. 66-67 de la TPO de la vista del 11 de septiembre de 2023.
[49] *Íd.,* págs. 68-70 de la TPO de la vista del 11 de septiembre de 2023. Al testigo se le mostró el *Exhibit* # 27.

arresto por delito grave.[50] El agente Ramírez Rodríguez afirmó que para el 3 y 11 de agosto de 2021 trabajaba para la División de Arrestos Especiales de Mayagüez y que el 11 de agosto de ese año estuvo investigando la orden de arresto en contra de González González.[51] El testigo declaró que González González era el más buscado del área de Mayagüez.[52] Expresó que contra este pesaba una orden de arresto por Ley de Armas, sustancias y tentativa de asesinato y que se trajo personal de San Juan para diligenciar la orden, por el tipo de persona que se estaba buscando.[53]

El testigo narró la forma en que interceptaron un Suzuki Aerio color gris y describió cómo, durante la persecución, los individuos que conducían este vehículo impactaron a otro vehículo que venía de frente.[54] El agente Ramírez Rodríguez describió cómo se bajaron el pasajero y el conductor, quien se bajó con una pistola negra, y resultó ser González González.[55] Narró que el Agte. Muriel Cintrón, de la División de Arrestos Especiales y Extradiciones de San Juan, y el Tte. Jason Reyes, Director de la División de Arrestos Especiales se encargaron de intervenir con González González, a quien se le ocupó una pistola color negra, mientras él arrestó al pasajero que había salido corriendo.[56]

El testigo afirmó que pudo observar el arma cuando pasó por el lado de González González, mientras perseguía al pasajero y, cuando regresó, el arma se encontraba por el lado de González González, quien estaba detenido.[57] Explicó que el arma fue ocupada por los agentes de Servicios Técnicos, quienes tomaron fotografías y la levantaron.[58] El agente Ramírez Rodríguez relató que, debido a que se podía observar que dentro del vehículo habían unos bultos y cajas de municiones de balas, se solicitó una orden de registro del vehículo.[59] El testigo mencionó que, al día siguiente, se diligenció la orden; que se ocuparon dos rifles que se encontraban en un bulto negro para rifle y en otro bulto negro; que uno de ellos estaba completamente armado, funcional; que el otro estaba desarmado y que estos rifles se entregaron a los agentes de Homicidios.[60] Al testigo se le mostraron los *Exhibits* #13 y #14, los cuales identificó como los rifles que ocupó en la parte posterior del vehículo.[61] Asimismo, se le mostró el *Exhibit* #16, el cual identificó como la pistola que tenía González González ese día en la mano, para salir corriendo.[62]

### Testimonio de la Agte. Zulmarie Troche Vega (agente Troche Vega):

La testigo afirmó que trabaja para el NPPR desde el 1999 y en la División de Vehículos Hurtados de Mayagüez

---

[50] *Íd.,* págs. 76-77 de la TPO de la vista del 11 de septiembre de 2023.
[51] *Íd.*, pág. 78 de la TPO de la vista del 11 de septiembre de 2023.
[52] *Íd.*, págs. 78-79 de la TPO de la vista del 11 de septiembre de 2023.
[53] *Íd.*, pág. 79 de la TPO de la vista del 11 de septiembre de 2023.
[54] *Íd.*, págs. 83-85 de la TPO de la vista del 11 de septiembre de 2023.
[55] *Íd.*, págs. 85-86 de la TPO de la vista del 11 de septiembre de 2023.
[56] *Íd.*, pág. 86 de la TPO de la vista del 11 de septiembre de 2023.
[57] *Íd.*, págs. 86-87 de la TPO de la vista del 11 de septiembre de 2023.
[58] *Íd.*, pág. 87 de la TPO de la vista del 11 de septiembre de 2023.
[59] *Íd.*
[60] *Íd.*, págs. 87-88 de la TPO de la vista del 11 de septiembre de 2023.
[61] *Íd.*, pág. 89 de la TPO de la vista del 11 de septiembre de 2023.
[62] *Íd.*

desde el 2018, donde se desempeña como investigadora.[63] Esta expuso que el 10 de agosto de 2021, mientras se encontraba trabajando en la División de Vehículos Hurtados de Mayagüez, recibió una querella en el área de retén a las 3:00 p.m.; que se comunicó con el Agte. Gricelio Lozada y que este le indicó que había llamado un caballero del distrito de San Germán, que ofreció información referente a un vehículo Kia Soul color azul que se encontraba estacionado en la Carretera 3314 en el Barrio Cotuí, por lo que la agente Troche Vega declaró que se dirigió en esa dirección con la Agte. Joaliss Arroyo.[64]

La testigo declaró que, al llegar al lugar, observaron la guagua con la descripción de la confidencia y que vio a un individuo que está pintando con *Plasti Dip* y que le dio el alto porque ya le habían informado que la tablilla no correspondía a ese vehículo.[65] La agente Troche Vega afirmó que, con el sistema David Plus, se puede verificar el dueño registral y la descripción del vehículo y que la descripción no coincidía; que pudo observar que taparon con *tape* una letra y un número de tablilla, así como que estaba alterada, por lo que, tras leerle las advertencias, detuvieron a Bryan Martell Cruz, residente de San Germán y, al revisar el número VIN del Kia Soul, encontraron que tenía gravamen por hurto.[66] La testigo explicó que fotografió el vehículo en el lugar y lo transportó a la División de Vehículos Hurtados de Mayagüez, en donde se evaluó por el Agte. Luis Montalvo (agente Montalvo), de Servicios Técnicos.[67]

La testigo agregó que, el 11 de agosto, el agente Montalvo verificó huellas en el vehículo y que el informe reveló que este arrojó positivo a las huellas dactilares de González González.[68] Añadió que verificó el sistema NCIC y que el vehículo se había hurtado en agosto de 2021 en el Barrio Cotto Laurel en Ponce, mediante *carjacking* a la señora Rentas y que, de acuerdo con la investigación, González González era uno de los sospechosos.[69] Al ser contrainterrogada, la testigo explicó que, aunque había otras huellas en el vehículo, las únicas huellas que fueron identificadas fueron las de González González.[70]

**Testimonio del Agte. Samuel Nieves Hernández (agente Nieves Hernández):**

El testigo afirmó que es agente del NPPR hace veinticuatro (24) años y está adscrito a la División de Servicios Técnicos hace catorce (14) años.[71] El agente Nieves Hernández relató que, el 3 de agosto de 2021, estaba asignado al turno de 8:00 p.m. a 4:00 a.m.; que le notificaron sobre los disparos en la Carretera 102 en Joyuda; que se dirigió al lugar de los hechos y que, al llegar a la escena, observó una guagua con impactos de bala y varios casquillos en el lugar.[72] El testigo agregó que fotografió la escena, el vehículo, recuperó la

---

[63] *Íd.*, pág. 93 de la TPO de la vista del 11 de septiembre de 2023.
[64] *Íd.*, págs. 94-96 de la TPO de la vista del 11 de septiembre de 2023.
[65] *Íd.*, pág. 97 de la TPO de la vista del 11 de septiembre de 2023.
[66] *Íd.* págs. 98-99 de la TPO de la vista del 11 de septiembre de 2023.
[67] *Íd.*, pág. 100 de la TPO de la vista del 11 de septiembre de 2023.
[68] *Íd.*
[69] *Íd.*, págs. 100-101 de la TPO de la vista del 11 de septiembre de 2023.
[70] *Íd.*, págs. 104-107 de la TPO de la vista del 11 de septiembre de 2023.
[71] *Íd.*, págs. 108-109 de la TPO de la vista del 11 de septiembre de 2023.
[72] *Íd.*, págs. 110-111 de la TPO de la vista del 11 de septiembre de 2023.

evidencia que había en el lugar y que luego fotografió al perjudicado en el Centro Médico de Mayagüez.[73] Al testigo se le mostraron los *Exhibits* #1-A al 1-#RRR, los que identificó como las fotos de la escena.[74] Igualmente, se le mostró el *Exhibit* #2-A a la #2-LL, los cuales identificó y especificó que el *Exhibit* #2 es la PPR603.1, donde se anota lugar, fecha y hora de los hechos, así como el número del caso que se le asigna, el número de la querella y tipo de caso; que, en el otro lado, había una foto de la víctima con una herida en el antebrazo; que los demás *Exhibits* eran un *close-up* del perjudicado, de la herida en el hombro, de la herida cubierta, del rostro del perjudicado en otro ángulo.[75] Durante su testimonio, el testigo aludió al resto de los *Exhibits* que se le fueron mostrando, entre estos, el *Exhibit* #1-K, el cual describió como una foto general de cómo quedó el vehículo.[76]

### Vista de 18 de septiembre de 2023

### Testimonio de Gustavo A. González González (González González):

Al comenzar su testimonio, González González declaró ser consciente de que sus respuestas lo podían incriminar, que renunciaba a su derecho a no autoincriminarse y que lo hacía libre y voluntariamente, sin que nadie le hubiese ofrecido nada a cambio de su testimonio.[77]

El testigo afirmó que lo conocen como Negro, Tavo, Gotay y BPA; que desde el 17 de febrero de 2021 es prófugo; que era el segundo más buscado en el área oeste, por cargos de tentativa de asesinato, Ley de Armas, violaciones a la Ley de Tránsito y violación a la Ley de Sustancias Controladas; que, para evitar que lo arrestaran, se mantenía debajo del radar, ya que le estaban pisando los talones; que no tenía un sitio fijo para dormir; que se movía de sitio por si lo estaban velando y detalló que se movía en carros alquilados. Asimismo, que tenía distintas formas de comunicarse, debido a que era un pilar importante en la calle, toda vez que tenía puntos de droga.[78]

El testigo declaró que llevaba casi cuatro (4) años vendiendo drogas, por lo que creaba conexiones en distintos pueblos y que la comunicación era importante porque ahí estaba su dinero y su vida.[79] González González agregó que solía cambiar de teléfono, por si le escuchaban las conversaciones; que los botaba y que hacía lo mismo con los chips del teléfono.[80] Durante su testimonio, el testigo afirmó que casi todos los asesinatos que ha cometido han sido por contrato; que le enviaban la información de la persona y sus fotos, así como otros datos, como dónde solía pararse; que las mataba de una; que la comunicación era muy importante porque si no, no había trabajo y que las comunicaciones las recibía a sus teléfonos de tapitas de prepago.[81]

---

[73] *Íd.*, pág. 112 de la TPO de la vista del 11 de septiembre de 2023.
[74] *Íd.*, pág. 113 de la TPO de la vista del 11 de septiembre de 2023.
[75] *Íd.*, págs. 114-116 de la TPO de la vista del 11 de septiembre de 2023.
[76] *Íd.*, págs. 117-126 de la TPO de la vista del 11 de septiembre de 2023.
[77] *Véase* págs. 19-21 de la de la TPO de la vista del 18 de septiembre de 2023.
[78] *Íd.*, págs. 25-27 de la TPO de la vista del 18 de septiembre de 2023.
[79] *Íd.*, pág. 28 de la TPO de la vista del 18 de septiembre de 2023.
[80] *Íd.*, págs. 29-30 de la TPO de la vista del 18 de septiembre de 2023.
[81] *Íd.*, pág. 31 de la TPO de la vista del 18 de septiembre de 2023.

Expresó que los teléfonos los adquiría en el garaje de gasolina o que mandaba a los "tecatos" a comprarlos; que si era necesario lo hacía todos los días; que una vez le daba el número nuevo a alguien de la calle esa persona le informaba el número a los demás; que como eran de tapita y que los utilizaba para llamadas y mensajes de texto. Asimismo, afirmó que también utilizaba otros teléfonos, como los IPhone que eran de su pana Rodríguez Torres, a quien conocía desde mayo de 2021 y le decía JM y a quien identificó como uno de sus gatilleros que cumplía sus órdenes.[82] González González declaró, además, que los contratos que hacía conllevaban matar gente por dinero; que lo llamaban a él, pero que a veces utilizaba el teléfono de Rodríguez Torres.[83]

El testigo declaró que el 2 de agosto de 2021, el apelante se comunicó con él por medio del teléfono de Rodríguez Torres, que era el que el testigo tenía en ese momento y que era uno de los de "tapita" que él utilizaba para los contratos.[84] González González sostuvo que la llamada la tomó Rodríguez Torres, que le pasó el teléfono y que el apelante le dijo que le tenía un contrato.[85] El testigo declaró que el apelante le dijo lo siguiente:

> **'Es fácil y sencillo. Son $10,000' ...Diantre son buenos. Eh 'si matas a una persona que trabaja en los Flan-es- Cedó. Él empieza a trabajar a las 8:00 de la mañana y sale como a las cinco o cinco y media de la tarde. Tiene una Dodge Ram blanca con los aros color negro……. Eso es por Joyuda. Un negocio que hay [...] un edificio por allí con acceso controlado, que ahí era donde vivía la tarjeta.[86]**

González González agregó que la palabra tarjeta se refería a la persona que tiene que matar; que el apelante quería muerta a esa persona y que ese tipo de contrato se hacía por llamada.[87] El testigo indicó que el apelante no le dio el nombre de la persona y que solamente le envió una foto al teléfono de Rodríguez Torres.[88] Declaró, además, que la llamada no fue extensa; que le solicitó al apelante un adelanto de $10,000, pero que este le indicó que no, que tenía que ser cuando el testigo matara a la persona y que ahí le pagaría el dinero completo.[89] Sostuvo, también, que iba a recibir el dinero del apelante en la casa de este; que la información del vehículo de la "tarjeta era importante porque ahí era que se iba a enfocar y que los detalles de donde vivía también lo eran[,] porque si no lo podía 'pillar saliendo de los flanes, lo pillaba en la casa o en el camino".[90]

El testigo narró que el 3 de agosto de 2021, arrancó en una Kia Soul Wave color azul "Pepsi" de 2016, que era *carjacking* porque se lo habían robado en Ponce y Rodríguez Torres se lo había vendido por $1,000.[91] González González explicó que, en esa fecha, salió con Rodríguez Torres, con

---

[82] *Íd.*, págs. 31-33 de la TPO de la vista del 18 de septiembre de 2023.
[83] *Íd.*, pág. 34 de la TPO de la vista del 18 de septiembre de 2023.
[84] *Íd.*, págs. 58-59 de la TPO de la vista del 18 de septiembre de 2023.
[85] *Íd.*, pág. 60 de la TPO de la vista del 18 de septiembre de 2023.
[86] *Íd.*, págs. 60-61 de la TPO de la vista del 18 de septiembre de 2023.
[87] *Íd.*, págs. 61-62 de la TPO de la vista del 18 de septiembre de 2023.
[88] *Íd.*, pág. 62 de la TPO de la vista del 18 de septiembre de 2023.
[89] *Íd.*, pág. 66-67 de la TPO de la vista del 18 de septiembre de 2023.
[90] *Íd.*, págs. 67-68 de la TPO de la vista del 18 de septiembre de 2023.
[91] *Íd.*, págs. 71-72 de la TPO de la vista del 18 de septiembre de 2023.

quien iba a realizar el contrato y que se había puesto de acuerdo con este el 2 de agosto de 2021.[92] Continuó narrando que Rodríguez Torres contrató un "satélite; que tenía una Glock 22 calibre cuarta generación, que está hecha para disparar todas las balas en ráfagas, con el propósito de matar; que Rodney A. Santiago Ramírez (Santiago Ramírez) llegó después en un Columbus Landing Kia Rio de 2016, color rojo, que se montó con ellos en la guagua y que, cuando este llegó, ya el testigo tenía la tablilla preparada con un *tape* y con un filo que la alteraba".[93]

González González afirmó que Santiago Ramírez tenía una Glock semiautomática calibre 40, modelo 23 con un peine 22.; que cuando el testigo estaba estacionado en Candelario, vio la guagua Dodge Blanca entrando por el caserío y que ahí le dijo a Santiago Ramírez que esa era la tarjeta y que la guagua Dodge hizo un viraje.[94] Afirmó que eran como las 3:00 o 4:00 p.m. y que la Dodge se dirigió hacia la planta de los Flan-es-Cedó.[95]

El testigo indicó que, posteriormente, se percataron que 'la tarjeta' estaba estacionándose con la Dodge RAM blanca, en el negocio Asia Italy, que salió de allí alrededor de las 8:00 p.m. y que había mucha iluminación.[96] En lo pertinente, González González declaró que, cuando la Dodge RAM blanca redujo la velocidad y colocó la señal, ya ellos estaban detrás de la guagua, por el lado derecho del conductor; que la víctima estaba entrando hacia lo que es el condominio; que estaba abriendo el portón y que Santiago Ramírez salió por el cristal de atrás, sacó parte del cuerpo y le metió un fuletazo y que, cuando le disparó, la guagua chocó con el portón del condominio.[97] Añadió que, cuando Santiago Ramírez, terminó de disparar, entonces el testigo sacó la pistola y le disparó, pero sus manos estaban dentro de la guagua, cayendo todos los casquillos Glock 23 calibre 40 dentro de la KIA Soul Wave, mientras los casquillos de la pistola de Santiago Ramírez cayeron en la carretera.[98]

El testigo recalcó que, cuando Santiago Ramírez terminó de disparar, el testigo dijo que lo iba a rematar y que era importante rematarlo porque, si no aseguraban la tarjeta, no había pago y añadió que comenzó a dispararle desde el mismo lado que lo hizo Santiago Ramírez, pero con la pistola semiautomática; que hizo siete (7) u ocho (8) disparos hacia la cara y que pensó que estaba muerto. [99]

Finalmente González González reiteró que el apelante fue quien le dio la información de dónde vivía la víctima, información que era importante para poder llevar a cabo el contrato.[100] Añadió que terminó de disparar y que se dirigió cerca de donde vive el apelante, pero que no fue en ese momento, sino que se dirigió hacia San Germán para esconder la guagua.[101] El testigo relató que le pasaron un paño con alcohol; que le tomaron una foto para venderla y

---

[92] *Íd.*, págs. 73-74 de la TPO de la vista del 18 de septiembre de 2023.
[93] *Íd.*, pág. 76-80 de la TPO de la vista del 18 de septiembre de 2023.
[94] *Íd.*, pág. 82-85 de la TPO de la vista del 18 de septiembre de 2023.
[95] *Íd.*, pág. 85 de la TPO de la vista del 18 de septiembre de 2023.
[96] *Íd.*, págs. 92 y 97 de la TPO de la vista del 18 de septiembre de 2023.
[97] *Íd.*, págs.103-106 de la TPO de la vista del 18 de septiembre de 2023.
[98] *Íd.*, pág. 106 de la TPO de la vista del 18 de septiembre de 2023.
[99] *Íd.*, pág. 107-109 de la TPO de la vista del 18 de septiembre de 2023.
[100] *Íd.*, págs. 109-110 de la TPO de la vista del 18 de septiembre de 2023.
[101] *Íd.*, pág. 109 y 111-112 de la TPO de la vista del 18 de septiembre de 2023.

que, posteriormente, se dirigieron hacia la casa del apelante.[102]

El testigo mencionó que llegaron a la casa del apelante entre las 8:00 o 9:00 p.m., que este les abrió el portón; que entraron y que observó una guagua gris de caja bien grande cerca de la cual estaba el apelante.[103] El testigo declaró que el apelante le preguntó sobre lo que hizo, que él le dijo que le vaciaron un peine 22 y que le había metido de 7 a 8 tiros y que de eso no lo salvaba nadie; que el apelante le dijo que no estaba todo el dinero; que tenía $5,500 a la mano y que le iba a dar un rifle y una pistola.[104] González González añadió que el apelante le ofreció y entregó $5,500, el rifle AR-15 Pistol con un peine 30 en un bulto que decía Paint Ball como de gotcha y una pistola MR-920 gris y negra, calibre 9, imitación a la Glock, 'customizada'.[105] El testigo afirmó que el apelante le entregó un sobre blanco con cincuenta y cinco (55) billetes de cien (100), los cuales contó frente a este; que los distribuyó entregándole $2,500 a Santiago Ramírez, $1,000 para el satélite, los cuales entregó a Rodríguez Torres para que se los hiciera llegar y añadió que él se quedó con el rifle y con lo que sobró del dinero, y que la pistola se la entregó a Rodríguez Torres.[106]

Sobre los actos posteriores, González González explicó que se quedó con la pistola que Santiago Ramírez usó para dispararle a la víctima; que le regaló a Santiago Ramírez un peine 22 y que la pistola Glock 22 se la ocupó la policía el 11 de agosto de 2021 cuando lo arrestaron.[107] Sobre estos extremos, el testigo narró que, en esa fecha, mientras la policía lo seguía, se fue a la fuga, chocó; que al bajarse del auto corrió y sacó la pistola Glock 22 calibre 40 para disparar y que esta era la misma con el láser y *flashlight*, que Santiago Rámirez había utilizado para dispararle a la "tarjeta" en Joyuda, la víctima, Andrés Llama Díaz.[108] Durante su testimonio, el testigo mencionó que en dicha intervención le ocuparon "un montón de peines de 22, de 30, de 40, de R-15, de AK, de todo" que estaban en el baúl del vehículo y que además, le ocuparon 1,292 balas, perico, marihuana, crack, y otras drogas, así como dos rifles, entre los cuales estaba el que le entregó el apelante.[109]

González González manifestó que, una vez lo arrestan, decidió cooperar libre y voluntariamente porque tenía cargo de conciencia, por lo que comenzó a hablar con el Tte. Aníbal Pérez.[110] El testigo indicó que se encontraba ingresado en la Cárcel Federal por un *indictment* de un caso de la zona de Sabana Grande, por la tentativa de asesinato en el presente caso y por todos los asesinatos y tiroteos en su "carrera criminal" y que no había recibido ningún privilegio.[111] Luego, se le mostraron los *Exhibits* #16, #13, #14, #40, #1-k los cuales identificó y describió con detalle.[112]

---

[102] *Íd.*, págs. 116 y 118-119 de la TPO de la vista del 18 de septiembre de 2023.
[103] *Íd.*, págs. 119-120 de la TPO de la vista del 18 de septiembre de 2023.
[104] *Íd.*, págs. 121-122 de la TPO de la vista del 18 de septiembre de 2023.
[105] *Íd.*, págs. 123-124 de la TPO de la vista del 18 de septiembre de 2023.
[106] *Íd.*, págs. 125-127 de la TPO de la vista del 18 de septiembre de 2023.
[107] *Íd.*, pág. 129 de la TPO de la vista del 18 de septiembre de 2023.
[108] *Íd.*, págs. 129-130 de la TPO de la vista del 18 de septiembre de 2023.
[109] *Íd.*, págs. 131-132 de la TPO de la vista del 18 de septiembre de 2023.
[110] *Íd.*, pág. 133 de la TPO de la vista del 18 de septiembre de 2023.
[111] *Íd.*, págs. 134-135 de la TPO de la vista del 18 de septiembre de 2023.
[112] *Íd.*, págs. 136-147 de la TPO de la vista del 18 de septiembre de 2023.

**Vista celebrada el 23 de septiembre de 2023**

**Contrainterrogatorio de González González:**

Al ser contrainterrogado, el testigo reiteró que habló con la policía voluntariamente.[113] Sostuvo, además, que el apelante le envió una foto de la "tarjeta" y el lugar donde este vivía, al celular de Rodríguez Torres; que este se la envió al testigo y que, cuando comparó la foto con la persona, lo identificó como el apelante, a quien no veía desde el 2019; que también reconoció su voz, ya que lo había llamado al teléfono suyo que tenía Rodríguez Torres y se refirió al apelante como "crakero".[114]

Finalmente, el testigo mencionó que tenía varios teléfonos y cambiaba los chips, y que le ocuparon un IPhone 8 Plus con videos de tiros y pistolas.[115]

**Redirecto de González González:**

En el redirecto el testigo reiteró que, aunque no había visto al apelante desde el 2019, reconoció su voz cuando lo llamó, ya que había hablado con este varias veces por teléfono, porque el apelante le compraba mucho *crack* a cada rato.[116]

**Vista celebrada el 25 de septiembre de 2023**

**Testimonio del Agte. Lasalle Vargas**

El testigo declaró que trabaja para el NPPR y que, desde el 2021, está adscrito a la Unidad Investigativa de Crímenes Cibernéticos del Departamento de Justicia.[117] Tras ser cualificado como perito, el testigo afirmó que, para el 21 de noviembre de 2021, el agente Acevedo Olivencia le entregó una orden de allanamiento, junto a un teléfono celular marca IPhone Modelo XR, que contenía información necesaria para su investigación en un caso por tentativa de asesinato y que cumplió con la orden de allanamiento y le entregó la información solicitada en un CD.[118]

El testigo expuso que se le ordenó recuperar cualquier data digital, documentos, imágenes, videos digitales, así como que extrajese la imagen forense, con el propósito de poder identificar al usuario del equipo o el que ejercía dominio o control del mismo. Asimismo, recuperar cualquier data digital que se relacione con la tentativa de asesinato, conspiración y la Ley de Armas.[119] El testigo describió en detalle el proceso de extracción de la información solicitada, lo que incluyó la foto de la víctima y la información extraída del celular del apelante, así como del celular de González González.[120]

---

[113] *Véase* pág. 15 de la TPO de la vista celebrada el 23 de septiembre de 2023.
[114] *Íd.*, págs. 15, 24-25, 36, 41, 44, 51 de la TPO de la vista celebrada el 23 de septiembre de 2023.
[115] *Íd.* págs. 71-73 de la TPO de la vista celebrada el 23 de septiembre de 2023.
[116] *Íd.*, págs. 127-128 de la TPO de la vista celebrada el 23 de septiembre de 2023.
[117] *Véase* pág. 18 de la TPO de la vista celebrada el 25 de septiembre de 2023.
[118] *Íd.*, págs. 18-19, 32-33 de la TPO de la vista celebrada el 23 de septiembre de 2023.
[119] *Íd.*, pág. 44 de la TPO de la vista celebrada el 23 de septiembre de 2023.
[120] *Íd.*, págs. 73-78 de la TPO de la vista celebrada el 23 de septiembre de 2023.

### Vista celebrada el 27 y 28 de septiembre de 2023

### Testimonio del Agte. José Acevedo Olivencia (agente Acevedo Olivencia):

El testigo declaró que es agente investigador del NPPR desde hace treinta y siete (37) años.[121] Tras cualificarse como perito, el testigo narró que, para el 3 de agosto de 2021, trabajaba en la División de Homicidios del CIC de Mayagüez y que ese día, luego de culminar sus labores, su supervisor lo llamó para investigar la agresión a tiros ocurrida en la Carretera 102 de Cabo Rojo, frente al portón del edificio Torre de Marsella.[122] El testigo declaró que, al trabajar la escena, se encontraron once (11) casquillos de bala calibre 40 y un proyectil de bala disparado y describió que observó que la Dodge Ram blanca de la víctima había impactado el portón. Además, que el vehículo presentaba impactos de bala en el lado izquierdo, por lo que concluyeron que dispararon hacia el área del conductor.[123] Añadió que los hechos ocurrieron aproximadamente a las 8:47 p.m., de acuerdo con la llamada realizada al sistema de emergencias 9-1-1 y que allí entrevistó a varias personas que llegaron al lugar tras la ráfaga de disparos; entre estos, a Moreau Pérez, y que luego entrevistó a otras personas en el hospital.[124]

Sobre la evidencia levantada en la escena, el testigo la describió y señaló que esta fue llevada al Instituto de Ciencias Forenses (ICF) y que la Dodge RAM blanca de la víctima se llevó a la Comandancia de la Policía de Mayagüez para ser trabajada por el personal del ICF.[125] El testigo añadió que fue al Centro Médico de Mayagüez y entrevistó al médico que atendió a la víctima, así como a un vecino de este que lo transportó al hospital, pero que, en ese momento, no pudo entrevistar a la víctima.[126] El testigo sostuvo que, el 5 de agosto de 2021, acudió a la planta de Flan-es-Cedó, a los fines de verificar información y que allí entrevistó a una persona.[127]

El agente Acevedo Olivencia aludió en su testimonio al arresto de González González; ofreció detalles sobre las armas que le fueron ocupadas y, además, señaló que este había autorizado a que le allanaran el teléfono.[128] El testigo expuso que González González afirmó que en el teléfono había una foto que el apelante le había enviado a su teléfono, que lo tenía en ese momento Rodríguez Torres, y que González González le manifestó que le tomó una foto con su teléfono a esa fotografía y que la recibió el 2 de agosto de 2021. Explicó que la custodia del IPhone la tenía el compañero Nelson González, a quien le solicitó una extracción de la unidad.[129] El testigo agregó que luego solicitó ver la extracción del teléfono para corroborar que estaba la foto que mencionó González González y que, al hacerlo, pudo corroborar que el apelante la había enviado al teléfono que en ese momento tenía Rodríguez Torres y que, a su vez, González González le había tomado la foto.[130] Señaló

---

[121] *Véase* pág. 64 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[122] *Íd.*, págs. 74-75 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[123] *Íd.*, págs. 78-79 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[124] *Íd.*, págs. 81-82 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[125] *Íd.,* pág. 83 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[126] *Íd.*, págs. 84-85 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[127] *Íd.*, págs. 86-87 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[128] *Íd.*, págs. 87-89 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[129] *Íd.*, págs. 89-91 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[130] *Íd.*, pág. 92 de la TPO de la vista celebrada el 27 de septiembre de 2023.

además, que dicha información, que incluyó videos que González González le indicó que había tomado mientras hacía vigilancia en la fábrica de Flan-es-Cedó y una foto cuando estaban detrás del vehículo a punto de cometer los actos, también se encontraba en la extracción del teléfono de González González. Por tanto, solicitó la orden de allanamiento, aunque este lo entregó de forma voluntaria.[131]

Durante su testimonio, el testigo aludió continuamente a las manifestaciones que le hizo González González sobre lo sucedido el 2 de agosto de 2021, referente a que el apelante lo había llamado para que matara a la "tarjeta", ofreciéndole $10,000 por asesinarla e indicándole que trabajaba en los Flan-es- Cedó y que siempre andaba en una Dodge RAM blanca con aros negros y que González González le había informado lo planificado con el apelante para luego comunicarse con Santiago Ramírez, gatillero de Ponce que lo asistiría.[132] El testigo indicó que, en efecto, González González utilizaba diferentes celulares, los cuales descartaba, así como las tarjetas eSIM Card.[133]

Sobre lo ocurrido el 3 de agosto de 2021, día de los hechos, el testigo relató con detalle lo que, a su vez, González González le había indicado y que había sido objeto también de su testimonio.[134]

Finalmente, el testigo declaró que González González le había manifestado que, mientras pernoctaba en un motel entre Moca y Añasco, el apelante lo llamó y que, aunque él no contestó, le devolvió posteriormente la llamada y que el apelante le había indicado que había fallado, porque la "tarjeta" estaba viva; que le pidió que le devolviera el dinero, pero que González González no se lo devolvió, ni lo volvió a llamar.[135]

Posteriormente, el testigo narró el proceso del arresto de González González y la ocupación de las armas, y afirmó que los resultados forenses arrojaron que la pistola disparó los once (11) casquillos y que las extracciones que hicieron de la guagua Dodge RAM blanca resultaron ser positivas a la referida pistola.[136]

Durante su testimonio, el testigo también aludió a que entrevistó a la víctima el 16 de agosto y que este estaba parapléjico. [137] El testigo, además, identificó los *Exhibits* que se le mostraron, particularmente, el *Exhibit* #29, e identificó la declaración de persona sospechosa PPR 615.9, la cual contenía su firma y la del apelante.[138]

El testigo igualmente declaró que, el 23 de agosto de 2021, había entrevistado a González González, que le leyó las advertencias y que la información que este le ofreció la había plasmado en la *Declaración de Persona Sospechosa*, la cual procedió a leer.[139] El agente Acevedo Olivencia atestó, además, sobre el peritaje que el personal del ICF le hizo a la Dodge RAM blanca e indicó que la versión de los hechos de González

---

[131] *Íd.*, págs. 92-93 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[132] *Íd.*, págs. 94-96 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[133] *Íd.*, pág. 101 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[134] *Íd.*, págs. 102-117 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[135] *Íd.*, págs. 117-118 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[136] *Íd.*, págs. 119-121 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[137] *Íd.*, pág. 122 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[138] *Íd.*, págs. 141-142 de la TPO de la vista celebrada el 27 de septiembre de 2023.
[139] *Véase* págs. 6-15 de la TPO de la vista celebrada el 28 de septiembre de 2023.

González era prácticamente similar a dicho análisis pericial.[140]

De igual forma, el testigo identificó el *Exhibit* #16 como el arma de fuego que se le ocupó a González González al momento de su arresto y la que disparó los once (11) casquillos y el proyectil de bala. Además, identificó los *Exhibits* #13 y #14 como el rifle calibre 223 y la AR 15 que le ocuparon a González González, respectivamente.[141] El testigo también identificó el *Exhibit* #44 como el CD con la extracción del teléfono de González González y declaró en detalle sobre el contenido de dicho CD, particularmente sobre las fotos y los vídeos.[142]

Al ser contrainterrogado, el testigo afirmó haber corroborado la información ofrecida por González González y expresó que, aunque en la extracción que se hizo del celular de este no se encontraron mensajes ni llamadas con el apelante, esto no lo desmentía.[143]

En el redirecto, el testigo sostuvo que González González le mencionó que el apelante le había enviado una foto al teléfono que en ese momento tenía Rodríguez Torres y que pudo corroborar la referida foto, tanto en la extracción del teléfono de González González, como en la extracción del teléfono del apelante, por lo que reiteró que todo lo relacionado al celular se corroboró, así como lo relacionado con el evento, cuando surgió, la tentativa de asesinato, el arma que se usó y que también se corroboró la balística.[144] Sobre el particular, el testigo aludió en el redirecto que solo realizó una extracción del celular a uno de los teléfonos de González González, puesto que él lo identificó como el que tenía la información relacionada con el caso y que dicha información la pudo corroborar, porque la encontró luego de realizado el proceso.[145]

El testigo también afirmó que la prueba en contra del apelante consistía en el testimonio corroborado de González González y las fotos.[146]

Culminado el desfile de prueba, el 3 de octubre de 2023, el Jurado emitió un veredicto unánime de culpabilidad en contra del apelante por los delitos de tentativa del Artículo 93(A) (asesinato) y violación al Artículo 244 (conspiración) del Código Penal de 2012, 33 LPRA secs. 5142(A) y 5334. Asimismo, le halló culpable por infracciones a los Artículos 6.08 (posesión de armas de fuego sin licencia), 6.09 (portación, posesión o uso ilegal de armas largas semiautomáticas, automáticas o escopeta de cañón cortado)

---

[140] *Íd.*, pág. 35 de la TPO de la vista celebrada el 28 de septiembre de 2023, y *Exhibit* #17.

[141] *Íd.*, págs. 41-43 de la TPO de la vista celebrada el 28 de septiembre de 2023.

[142] *Íd.*, págs. 53-58 de la TPO de la vista celebrada el 28 de septiembre de 2023.

[143] *Íd.*, págs. 74; 80-81 de la TPO de la vista celebrada el 28 de septiembre de 2023.

[144] *Id.*, págs. 178-179 de la TPO de la vista celebrada el 28 de septiembre de 2023.

[145] *Id.*, págs. 182-183 de la TPO de la vista celebrada el 28 de septiembre de 2023.

[146] *Id.*, págs. 186-187 de la TPO de la vista celebrada el 28 de septiembre de 2023.

y 6.11 (facilitación de armas a terceros) de la *Ley de Armas de Puerto Rico de 2020*, Ley Núm. 168-2019, según enmendada, 25 LPRA secs. 466g, 466h y 466j.

El 3 de noviembre de 2023, el foro primario sentenció al apelante a una pena de cárcel de veinte (20) años por la tentativa al Artículo 93(A) (Asesinato) del Código Penal y a tres (3) años por violación al Artículo 244 (conspiración) del Código Penal, concurrentes estas entre sí. Así también, lo sentenció a cumplir cinco (5) años de cárcel por violación al Artículo 6.08 de la Ley Núm. 168-2019, veinticuatro (24) años de cárcel por infracción al Artículo 6.09 de la Ley Núm. 168-2019 y doce (12) años de cárcel por dos cargos de violación al Artículo 6.11 de la Ley Núm. 168-2019. Las penas impuestas totalizan setenta y tres (73) años, a cumplirse de forma consecutiva con cualquier otra pena pendiente.

Inconforme con el veredicto y con la *Sentencia* impuesta, el apelante acudió ante nos mediante el recurso de apelación de epígrafe y señaló los siguientes errores:

> Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la *Moción Urgente en Solicitud de Orden al Amparo de la Regla 95* y de lo resuelto en los casos normativos *Pueblo v. Casanova*, 161 DPR 183 (2004) y *Pueblo v. Velázquez Colón*, 174 DPR 304 (2008), al interpretar que era tardía, ello en crasa violación al debido proceso de ley, privando al acusado del derecho a contrainterrogar de forma real y efectiva al único testigo de hechos, y en violación a otros derechos constitucionales que cobijan al acusado.

> Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la *Moción de Separación de Juicios* por interpretar que era tardía, a pesar de que se ventilaría un mismo juicio contra dos acusados, uno de ellos en ausencia, y con conocimiento de que el coacusado ausente realizó actos y expresiones incriminatorias las cuales eran inadmisibles contra el aquí acusado apelante, lo cual acarreó perjuicios y perjudicó los derechos fundamentales del acusado apelante, al no permitir que el jurado juzgara de forma individual e imparcialmente el testimonio de un acusador falto de integridad e indigno de crédito[,] en crasa violación al debido proceso de ley y otros derechos constitucionales que cobijan al acusado apelante.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la moción de supresión de evidencia de la extracción del celular del apelante, por interpretar que dicha moción era tardía, a pesar de que [de] la propia orden de registro surgía la invalidez, la ilegalidad e irracionabilidad, al adolecer de especificidad y que de la información que da base a la obtención de la misma, y surgiendo además, que el diligenciamiento fue posterior al término estatutario establecido en las Reglas de Procedimiento Criminal, en crasa violación al debido proceso de ley y otros derechos constitucionales que cobijan al acusado apelante.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar el escrito solicitando la desestimación de la acusación de conspiración, a pesar de que la misma incluía alegaciones inadmisibles en derecho, elementos de delito incompatibles entre sí y acumulación de elementos subjetivos de delito, lo que ocasionó un perjuicio sustancial al acusado apelante, al tener un efecto inflamatorio, perjudicial, grave, sustancial e insubsanable contra el acusado apelante, lo cual ocasionó una violación al debido proceso de ley y a una representación legal adecuada y eficaz.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la *Solicitud de Instrucciones Especiales al Jurado*, lo cual ocasionó perjuicio y desorientación al jurado al momento de rendir un veredicto conforme a la prueba presentada y conforme a derecho.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la *Solicitud de Orden*, en la cual se solicitó que se entregara información pertinente a la inocencia del acusado apelante, con conocimiento de que parte de la información solicitada surgió durante el desfile de la prueba del ministerio público y a pesar de que la misma es evidencia exculpatoria conforme al Artículo II Sección 7 de la Constitución del Estado Libre Asociado de Puerto Rico y las Enmiendas V y XIV de la Constitución de los Estados Unidos, lo cual provocó un juicio injusto y parcializado contra el acusado.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la *Moción al Amparo de la Regla 404 de Evidencia*, a pesar de que en el caso de autos el único testigo de hechos es un coautor cuyo testimonio tenía que ser examinado con cautela y desconfianza, lo cual ocasionó que el jurado evaluara y tomara en consideración al momento de emitir el veredicto, evidencia inadmisible lo cual ocasionó confusión, peligro indebido, perjuicio y desorientación al jurado, al permitir que el testigo cooperador se refiriera al apelante como craquero y otra evidencia de carácter similares.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al declarar sin lugar la petición de la defensa, de examinar el teléfono celular ocupado al testigo cooperador y del cual el Estado extrajo información selectiva y limitada, lo cual provocó que el acusado apelante no tuviera acceso al registro de llamadas del teléfono ocupado al testigo cooperador, lo cual es prueba exculpatoria, violentando el debido proceso de ley, provocando perjuicio, confusión y desorientación al jurado.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, al sostener una convicción basada en el testimonio flaco, descarnado y mendaz de un testigo cooperador, sin ningún tipo de corroboración y sin que se probara la culpabilidad del acusado apelante, más allá de toda duda razonable con prueba admisible en derecho, esto en crasa violación al debido proceso de ley, el derecho a la confrontación y otros derechos constitucionales.

Erró el Honorable Tribunal Superior de Mayagüez, por voz de la Honorable Jueza Vilmary Rodríguez Pardo, en declarar sin lugar la *Solicitud de Mistrial* presentada por la defensa y sin tomar ninguna providencia para determinar si el jurado había sido o no contaminado con publicidad excesiva, consistente en un video que publicó el periódico Primera Hora el mismo día en que se sometió el caso y que el Jurado tuvo cuatro (4) días para ver, y repasar la teoría falsa de la fiscalía.

El 10 de octubre de 2024, las partes presentaron la Transcripción de la Prueba Oral Estipulada (TPO). Por su parte, el 17 de diciembre de 2024, el apelante presentó el *Alegato de la Parte Apelante*. Así, Llama Díaz nos solicita que, tras examinar la TPO, procedamos a excluir como prueba de cargo las fotos extraídas por el Agte. Lasalle del celular del apelante. Ello, por fundamentos que, según alega, surgieron a raíz del contrainterrogatorio realizado durante el juicio y cuyo conocimiento advino la defensa en ese momento.

En específico, el apelante subrayó que las fotos datan de una fecha previa a la alegada conspiración. De igual forma, el apelante arguyó que la orden de registro fue solicitada y expedida con información falsa y sostiene que la orden autorizaba únicamente a extraer fotos de Andrés Llama Díaz que hubiesen sido enviadas desde el celular del apelante. Entiéndase, que, toda vez que dicha

condición para la extracción no se dio, el Estado carecía de autoridad para extraer las referidas fotos. Es la postura del apelante que toda la prueba objeto de la moción de supresión de evidencia que presentó ante el foro primario, fue descubierta durante la etapa del juicio.

Finalmente, es la contención principal del apelante que su convicción está basada en el testimonio no corroborado de un testigo mendaz, quien además es un asesino confeso. Consecuentemente, nos urge a tomar estos criterios en consideración al aquilatar el testimonio de González González, por considerar que este fue errático en sala y exhibió un *demeanor* cuestionable.

Por su parte, el 25 de marzo de 2025, el Pueblo de Puerto Rico compareció representado por la Oficina del Procurador General, mediante un *Alegato del Pueblo*. En su comparecencia, discutió su postura respecto a los señalamientos de error que esgrimió el apelante, referentes a la apreciación de la prueba oral por parte del foro primario, así como los alegados errores de derecho en que el foro *a quo* incurrió.

En apretada síntesis, el Pueblo sostuvo que el Ministerio Público desfiló prueba admisible y suficiente para demostrar que el apelante cometió los delitos por los que fue acusado y que probó más allá de duda razonable los delitos de tentativa de asesinato, conspiración y violaciones a la Ley Núm. 168-2019. Asimismo, adujo que los tres primeros señalamientos de error formulados por el apelante están relacionados con la presentación tardía de varias solicitudes, entre estas la solicitud de descubrimiento de prueba, de separación de juicios y de supresión de evidencia.

En lo referente a la Orden de Registro y Allanamiento emitida por el foro primario, en la que autorizó la extracción del celular del apelante, el Pueblo esgrimió que estuvo fundamentada en la declaración jurada del Agte. José L. Acevedo Olivencia (agente

Acevedo Olivencia). Asimismo, que durante su testimonio este entró en detalles sobre los hallazgos obtenidos durante su investigación, los que justificaron la solicitud para extraer la información del dispositivo, el cual fue entregado voluntariamente por el apelante. Destacó, además, que, mediante la orden, se autorizó la extracción física del celular, lo cual incluyó la galería de fotos, por lo que la extracción se hizo conforme a derecho. En lo pertinente a los señalamientos quinto, sexto y octavo, el Pueblo arguyó que el Ministerio Público entregó a la defensa toda la información disponible, la cual no contenía prueba exculpatoria.

En cuanto a la extracción realizada al dispositivo de González González, testigo cooperador, es la postura del Pueblo que el Ministerio Público contaba con la extracción de información específica que el agente Acevedo Olivencia había solicitado y no con la extracción total del dispositivo del testigo cooperador que se hizo en otro caso. Señala que, a pesar de ello, y a solicitud del apelante, dicha extracción total relacionada con otro caso, fue examinada en sala y pudo corroborar que no tenía prueba exculpatoria. De igual forma, puntualizó que dicha extracción total fue entregada al apelante antes del testimonio de González González.

En cuanto al señalamiento del apelante sobre la admisibilidad de prueba de carácter, el Pueblo argumentó que esta prueba no se presentó para probar propensión, sino conocimiento y motivo. Por tanto, señaló que estuvo correctamente admitida.

Finalmente, el Pueblo sostuvo que las alegadas irregularidades que el apelante expuso para fundamentar su solicitud de disolución del Jurado -particularmente, una noticia publicada y el comentario de un agente investigador referente a que otro acusado había levantado las manos- fueron, la primera, especulativa y, la segunda, una respuesta a preguntas de la defensa. Aun así, no constituyeron errores sustanciales y fueron

debidamente atendidas mediante instrucciones específicas y oportunas al Jurado.

Por último, el Pueblo aludió a la presunción de corrección del veredicto unánime del Jurado. Esto, debido a que el Jurado tuvo la oportunidad de aquilatar la prueba de cargo, mediante la adjudicación de credibilidad a los testigos.

Así, evaluados los escritos de las partes, la TPO y los autos originales del caso de epígrafe, y tras la presentación del *Alegato de Pueblo*, estamos en posición de resolver.

## II

### A. *Descubrimiento de Prueba, Regla 95 de Procedimiento Criminal y la prueba exculpatoria.*

Nuestro sistema de justicia criminal reconoce que el derecho de la persona acusada a descubrir prueba es "consustancial con el derecho a defenderse adecuadamente". *Pueblo v. Sanders Cordero*, 199 DPR 827, 835 (2018). Sin embargo, tal derecho no es absoluto, por lo que la Regla 95 de Procedimiento Criminal, 34 LPRA Ap. II, R. 95, delimita lo relacionado con el descubrimiento de prueba a favor del acusado durante el curso del caso ante el foro primario. *Íd.* La citada regla establece, en lo pertinente, lo siguiente:

> (a) El acusado presentará moción al amparo de esta Regla dentro en un término de cumplimiento estricto de veinte (20) días contados a partir de: i) la celebración del acto de lectura de acusación en los casos que se impute la comisión de un delito grave; o ii) la primera comparecencia del acusado al proceso asistido por el abogado que habrá de representarlo en el juicio, en los casos en que se impute la comisión de un delito menos grave. . . . Sometida la moción de la defensa conforme a lo dispuesto en esta Regla, el Tribunal ordenará al Ministerio Fiscal . . . que permita al acusado inspeccionar, copiar o fotocopiar . . . material o información que está en posesión, custodia o control del Ministerio Fiscal o a cualquier agencia o instrumentalidad pública . . . *Íd.*
>
> […]
>
> (4) Cualquier libro, papel, documento, fotografía, objeto tangible, estructura o lugar que sea relevante para preparar adecuadamente la defensa del acusado, que el

Ministerio Fiscal se propone utilizar en el juicio o que fue obtenido del acusado o perteneciera al acusado.

[…]

(b) El Ministerio Fiscal revelará toda aquella evidencia exculpatoria del acusado que tenga en su poder.
(c) La defensa deberá incluir, junto con la solicitud de Descubrimiento de Prueba, las órdenes necesarias para solicitar el material o la información que prevee que el Ministerio Público no tendrá bajo su custodia, dirigidas a las personas o entidades que la poseen, custodian o controlan. El Ministerio Público deberá entregar la información y/o material solicitado que tenga bajo su custodia o control e informar al tribunal si existe algún material o información que le fue solicitada, pero que no se encuentra bajo su posesión, custodia o control, en cuyo caso el tribunal ordenará a la persona o entidad que lo posea, custodie o controle que lo ponga en disposición del acusado. [...]

Cónsono con lo anterior, luego de la acusación por la comisión de un delito grave y previa moción de la persona acusada, se activa la obligación del Ministerio Público de descubrir prueba a favor de la defensa. *Soc. Asist. Leg. v. Ciencias Forenses*, 179 DPR 849, 858-859 (2010). Sobre la Regla 95, el Tribunal Supremo dispone que "esta [...] fija el momento en que los abogados de la defensa tendrán derecho a obtener, y el Ministerio Público la obligación de entregar, prueba a favor del acusado". *Íd.*, pág. 865. Entre los materiales o información de la cual se puede obtener copia, fotocopiar o inspeccionar se encuentran: "[c]ualquier libro, papel, documento, fotografía, objeto tangible, estructura o lugar que sea relevante para preparar adecuadamente la defensa del acusado, que el Ministerio Fiscal se propone utilizar en el juicio o que fue obtenido del acusado o perteneciera al acusado". Regla 95(a)(4), 34 LPRA Ap. II, R. 95 (a)(4).

Asimismo, la Regla 95B de Procedimiento Criminal, 34 LPRA Ap. II, R. 95B, sobre las "normas que regirán el descubrimiento de prueba", exige el deber continuo de informar la prueba descubierta. Al respecto, en su inciso (a), la citada regla establece lo siguiente:

> Si antes de o durante el juicio, una parte descubre prueba o material adicional al que fue previamente requerido u ordenado, que está sujeto a descubrimiento bajo las Reglas 95 y 95A, dicha parte deberá notificar, tan pronto advenga en conocimiento de la existencia de esa evidencia o material adicional, a la otra parte, al abogado de dicha parte o al tribunal.

Regla 95B(a) de Procedimiento Criminal, 34 LPRA Ap. II, R. 95B(a).

En lo pertinente, es importante destacar que el descubrimiento de prueba debe culminarse en un plazo no mayor de diez (10) días previo a la celebración del juicio. Regla 95B(b) de Procedimiento Criminal, 34 LPRA Ap. II, R. 95B(b). Sobre estos extremos, el Tribunal Supremo ha reconocido lo siguiente:

> Es el tribunal el encargado de ejercer la forma en que se hará el descubrimiento, así como los términos y las condiciones que considere justos y necesarios. En ese sentido, tiene el deber de "garantizar un procedimiento que conduzca a la presentación de la evidencia adecuada que sea pertinente a la controversia de hechos, evitando hasta donde sea posible que la sorpresa y la ocultación —resultado inevitable del proceso adversativo— oscurezcan e impidan la búsqueda de la verdad". (Citas omitidas) (Énfasis nuestro)

*Pueblo v. Rodríguez González*, 202 DPR 258, 272 (2019).

Asimismo, el Ministerio Público debe ser diligente en la entrega del descubrimiento de prueba solicitado por la defensa. El Tribunal Supremo también ha resuelto que constituye una violación al derecho de juicio rápido y, por ende, podría acarrear la desestimación de los cargos, la entrega tardía de la prueba de parte de Fiscalía. Véase *Pueblo* v. *Santa-María Bacardí*, 149 DPR 223 (1999).

De igual forma, se ha reconocido que la concesión de los asuntos referentes a la solicitud de descubrimiento de prueba descansa en la facultad discrecional del tribunal que juzga el caso. *Pueblo* v. *Custodio Colón*, 192 DPR 567, 586 (2015). Asimismo, es doctrina reiterada que el foro sentenciador es el encargado de ejercer cómo se hará el descubrimiento de prueba, así como los términos y

las condiciones que considere justos y necesarios. *Pueblo* v. *Rodríguez González*, 202 DPR 258, 272 (2019).

Sobre estos extremos, en *Pueblo* v. *Casanova*, 161 DPR 183 (2004) el Tribunal Supremo avaló la solicitud de la defensa de descubrir prueba consistente en la entrega de declaraciones juradas prestadas por el testigo de cargo en otro caso no relacionado. Ello, al concluir que, en las circunstancias particulares del caso ante su consideración, dicha declaración jurada era relevante a la teoría de la defensa sobre la mendacidad del testigo de cargo.

Es menester destacar que, entre las circunstancias excepcionales en las cuales se activa la protección del debido proceso de ley, permitiendo así un descubrimiento de prueba que exceda los límites textuales de la Regla 95 de Procedimiento Criminal, *supra*, se encuentra la producción de cualquier declaración que contenga prueba exculpatoria o indicios de falsedad en la prueba del Estado.

Cónsono con lo anterior, nuestro Tribunal Supremo adoptó la definición de prueba exculpatoria establecida en el caso normativo del máximo foro federal, *Brady v. Maryland*, 373 US 83 (1963), considerándola como aquella prueba material o favorable que tiene relevancia para la inocencia o la imposición de la pena del acusado. Ello, independientemente de la buena o mala fe demostrada por el Estado. *Pueblo v. Vélez Bonilla*, 189 DPR 705, 718-719 (2013). La evidencia se considera material si existe una probabilidad razonable de que, de haberse revelado a la defensa con anterioridad, el resultado del proceso habría sido diferente. *Strickler v. Green*, 527 US 263, 280 (1999). No obstante, es importante aclarar que la evidencia exculpatoria no es necesariamente aquella, que por sí sola puede dar lugar a la absolución del acusado, sino más bien toda evidencia que, de manera general, pueda beneficiar al acusado

respecto a su falta de culpabilidad o la aplicación de la pena. *Pueblo v. Vélez Bonilla*, supra, pág. 719.

Bajo el crisol doctrinario previamente expuesto, ante un planteamiento sobre prueba exculpatoria, nuestro Tribunal Supremo ha establecido que:

> [E]l imputado de delito podrá solicitar del tribunal que le ordene al fiscal que descubra dicha prueba, sin importar si el testigo ha declarado en alguna de las etapas preliminares del proceso. No obstante, el imputado viene en la obligación de demostrar afirmativamente que la declaración jurada de que se trata, con toda probabilidad, contiene evidencia exculpatoria o relevante a su inocencia o castigo. *Pueblo v. Romero Rodríguez*, ante, pág. 440. Ello a tenor con lo expresado por el Tribunal Supremo a los efectos de que cuando la defensa solicita que el fiscal ponga a su disposición la declaración de alguno de sus testigos de cargo —bajo el argumento de que la misma contiene evidencia exculpatoria o beneficiosa al acusado— **es necesario que los tribunales exijan "alguna demostración afirmativa de la existencia de esa prueba", y no meras especulaciones que alimenten los argumentos de la defensa.**

*Pueblo v. Arzuaga*, 160 DPR 520, 540-541 (2003). (Énfasis nuestro).

### B. *La Regla 89 de Procedimiento Criminal y la Separación de Juicios.*

La Regla 89 de Procedimiento Criminal, 34 LPRA Ap. II, R. 89, establece, en lo pertinente, lo que sigue:

> El tribunal podrá ordenar que dos o más acusaciones o denuncias sean vistas conjuntamente si los delitos y los acusados, si hubiere más de uno, pudieron haber sido unidos en una sola acusación o denuncia. El proceso se seguirá como si se tratare de una sola acusación o denuncia.
> . . . . . . . . .

La Regla 89 confiere al foro primario la facultad de decretar que dos o más acusaciones o denuncias se ventilen de manera conjunta, siempre que los delitos y los acusados, de haber varios, pudieran haberse incluido en una sola acusación por provenir de un mismo acto, transacción o plan común. Regla 89 de Procedimiento Criminal, *supra*. Esta disposición responde a la política pública de nuestro ordenamiento, en la medida en que la acumulación de

causas promueve la economía procesal y evita la duplicidad de juicios. Véase, E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1995, Vol. III, sec. 25.2A, pág. 194.

Por su parte, la Regla 37 de Procedimiento Criminal, 34 LPRA Ap. II, R. 87, regula los parámetros aplicables a la acumulación de delitos y acusados en una misma acusación o denuncia. Conforme a esta norma, el foro primario puede imputar dos o más delitos dentro de la misma acusación, en cargos separados para cada uno, siempre que los delitos sean de igual o similar naturaleza, hayan surgido del mismo acto o transacción, o deriven de actos o transacciones relacionadas entre sí o que formen parte de un plan común. Regla 37 de Procedimiento Criminal, *supra*. Asimismo, las alegaciones de un cargo podrán incorporarse en los demás cargos por referencia. *Íd.* De este modo, se garantiza que el tribunal pueda examinar en su integridad hechos conexos, promoviendo la economía procesal, sin menoscabo de los derechos de los acusados.

Ahora bien, aun cuando nuestro ordenamiento jurídico favorece la consolidación de acusaciones en un solo juicio, esta facultad no es absoluta. La Regla 90 de Procedimiento Criminal, 34 LPRA Ap. II, R. 90, dispone que, <u>cuando se demuestre que la acumulación de cargos puede causar perjuicio a alguna de las partes, el tribunal debe decretar la separación de los juicios o conceder el remedio que en justicia corresponda</u>. Así pues, corresponde a quien solicite la separación de procedimientos acreditar el perjuicio que representa dicha acumulación. *Pueblo v. Virkler*, 172 DPR 115, 128 (2007).

Recalcamos que la parte que solicita la separación de causas debe demostrar que la duplicación de vistas derivadas de los mismos

hechos provocaría serias inconveniencias, tanto para el Estado como para las personas afectadas. *Íd.*, pág. 125. Véase, además, E.L. Chiesa Aponte, *op. cit.*, pág. 187. Ahora bien, si el perjuicio es mínimo, "debe ceder ante el beneficio que representa la vista conjunta, en tiempo y dinero". *Pueblo v. Maya Pérez*, 99 DPR 823, 826 (1971).

Por su parte, la Regla 93 de Procedimiento Criminal, 34 LPRA Ap. II, R. 93, establece el procedimiento formal y los términos para solicitar la acumulación o separación de causas criminales. La referida regla dispone que la solicitud para la acumulación o separación de causas al amparo de la Regla 89, *supra*, deberá presentarse por escrito, con no menos de veinte (20) días de antelación al juicio, y expresará las razones en las que se funda. Véase, Regla 93 de Procedimiento Criminal, *supra*. No obstante, el tribunal podrá permitir, por causa justificada, que dicha solicitud se presente en cualquier momento antes de ser llamado el caso para juicio. *Íd.*

### C. *La Orden de Registro y Allanamiento, y la Moción de Supresión de Evidencia al amparo de la Regla 234 de Procedimiento Criminal.*

El Artículo II, Sección 10, de la Constitución de Puerto Rico establece lo siguiente:

> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse. Evidencia obtenida en violación a esta sección será inadmisible en los tribunales.

Artículo II, Sec. 10, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 336.

Por su parte, la Enmienda IV de la Constitución de Estados Unidos consagra el derecho de todo ciudadano a ser protegido contra registros y allanamientos irrazonables. Emda. IV, Const. EE. UU., LPRA, Tomo 1, ed. 2016, pág. 186-87. De ordinario, se prohíbe el arresto de personas o registros o allanamientos, sin una previa

orden judicial, apoyada esta en una determinación de causa probable. *Pueblo v. Serrano Reyes*, 176 DPR 437, 443 (2009); *Pueblo v. Calderón Díaz,* 156 DPR 549, 555 (2002). Todo registro, allanamiento o incautación de material de contrabando que realice el Estado se presume irrazonable cuando se realiza sin orden judicial previa. *Pueblo v. Serrano Reyes*, supra, pág. 447; *E.L.A. v. Coca Cola Bott. Co.*, 115 DPR 197, 207 (1984). Véase, además, *Katz v. United States*, 389 US 347 (1967). Además, si la actuación del Estado constituye un registro, es necesario determinar si la persona afectada tenía una expectativa de intimidad sobre el lugar o artículo a ser registrado y si tal expectativa es razonable a la luz de los criterios prevalecientes en la sociedad. *Pueblo v. Díaz, Bonano,* 176 DPR 601, 612 (2009); *Pueblo v. Santiago Feliciano*, 139 DPR 361, 384 (1995).

Ahora bien, para que se pueda realizar un registro o allanamiento, es necesario que un juez emita una orden a tales efectos. Por lo tanto, es un requisito indispensable que un magistrado determine que existe causa probable para creer que en un lugar específico se encuentra un objeto delictivo o un objeto que constituye evidencia de delito. *Pueblo v. Santiago Feliciano,* supra. Es por ello que nuestro ordenamiento jurídico regula lo concerniente a la expedición de este tipo de órdenes judiciales a través de la Regla 231 de Procedimiento Criminal, 34 LPRA Ap. II, R. 231.

La referida regla establece que, para que se expida una orden de allanamiento, debe presentarse una declaración escrita prestada ante un magistrado bajo juramento, en la que se expongan los hechos que sirvan para librarla. *Íd.* Si el magistrado entiende que existe causa probable para el registro o allanamiento, emitirá la orden en la cual se nombrarán o describirán con particularidad la persona o el lugar a ser registrado y las cosas o propiedad a ocuparse. *Íd.* El Tribunal Supremo ha manifestado que este tipo de

orden judicial deberá incluir los fundamentos específicos que dieron base a su expedición. *Pueblo v. Rolón Rodríguez*, 193 DPR 166, 179 (2015).

Nuestro más Alto Foro ha resuelto que, si bien no es necesario una transcripción literal de los fundamentos contenidos en la declaración jurada, es necesario que la orden exprese sucintamente los hechos materiales expuestos en la declaración, sintetizándolos de modo que se haga constar allí cuáles son los fundamentos de la petición. *Pueblo v. Cintrón*, 80 DPR 360, 363 (1958). De igual forma, es esencial que la declaración jurada exprese la fecha en que se observaron los hechos. *Pueblo v. Tribunal Superior*, 91 DPR 28 (1964). No obstante, estas declaraciones pueden impugnarse mediante prueba que demuestre que lo afirmado bajo juramento es falso. *Laureano Maldonado v. Tribunal Superior*, 92 DPR 381, 391 (1965).

Luego de examinar la declaración jurada, es necesario la determinación de causa probable por parte del magistrado. Según la jurisprudencia federal y estatal, la causa probable es un juicio de probabilidad por parte de una persona prudente y razonable. *Pueblo v. Tribunal Superior*, supra, págs. 25-26. Además, la determinación de causa probable puede estar fundamentada a base de los hechos percibidos por el que hace la declaración jurada, por la información que el declarante recibió de un tercero o por una combinación de ambas circunstancias. *Pueblo v. Santiago Feliciano*, supra, pág. 408; *Pueblo v. Muñoz, Colón y Ocasio*, 131 DPR 965, 980 (1992).

Una vez el juez expida la orden, esta debe ser diligenciada en un término de diez (10) días. Regla 232 de Procedimiento Criminal, 34 LPRA Ap. II, R. 232. Por otro lado, las personas que son agraviadas por un registro o allanamiento ilegal cuentan con una serie de remedios. Uno de los remedios más destacables es la llamada regla de exclusión. E.L. Chiesa Aponte, <u>Derecho Procesal</u>

Penal: Etapa Investigativa, Estados Unidos, Publicaciones JTS, 2006, pág. 109. Dicha regla es de origen constitucional y establece que toda evidencia obtenida de manera ilegal no será admitida en nuestros tribunales. Por lo tanto, mediante una moción de supresión de evidencia instada en un procedimiento criminal, se podrá solicitar que esta evidencia no sea considerada.

En lo pertinente, la Regla 234 de Procedimiento Criminal, 34 LPRA, Ap. II, R. 234, provee el mecanismo para hacer valer la protección constitucional contra actuaciones irrazonables del Estado bajo la Cuarta Enmienda de la Constitución de Estados Unidos y la Carta de Derechos de nuestra Constitución. El Tribunal atenderá la solicitud de suprimir evidencia ilegalmente obtenida bajo cualquiera de los siguientes fundamentos:

> (a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro.
>
> (b) Que la orden de allanamiento o registro es insuficiente de su propia faz.
>
> (c) Que la propiedad ocupada o la persona o sitio registrado no corresponde a la descripción hecha en la orden de allanamiento o registro.
>
> (d) Que no había causa probable para creer en la existencia de los fundamentos en que se basó la orden de allanamiento o registro.
>
> (e) Que la orden de allanamiento fue librada o cumplimentada ilegalmente.
>
> (f) Que es insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente.

Regla 234 de Procedimiento Criminal, *supra*.

La Regla 234 de Procedimiento Criminal, 34 LPRA, Ap. II, R. 234, dispone también lo siguiente:

> […]
>
> En la moción de supresión de evidencia se deberán exponer los hechos precisos o las razones específicas que sostengan el fundamento o los fundamentos en que se basa la misma. El tribunal oirá prueba sobre cualquier cuestión de hecho necesaria para la resolución de la solicitud y celebrará una vista evidenciaria ante un magistrado distinto al que atenderá el juicio, cuando se trate de evidencia

> incautada mediando una orden judicial y la parte promovente demuestre que existe una controversia sustancial de hechos que haga necesario la celebración de la vista; **en ausencia de tal demostración, el tribunal podrá adjudicar la moción sin vista previa utilizando base como los escritos presentados por las partes.**
>
> El tribunal vendrá obligado a celebrar una vista evidenciaria con antelación al juicio, y ante un magistrado distinto al que atenderá el juicio, cuando se trate de evidencia incautada sin previa orden judicial si en la solicitud la parte promovente aduce hechos o fundamentos que reflejan la ilegalidad o irrazonabilidad del registro, allanamiento o incautación. El Ministerio Público vendrá obligado a refutar la presunción de ilegalidad del registro o incautación y le corresponderá establecer los elementos que sustentan la excepción correspondiente al requisito de orden judicial previa.
>
> De declararse con lugar la moción, la propiedad será devuelta, si no hubiere fundamento legal que lo impidiere, y no será admisible en evidencia en ningún juicio o vista. **La moción se notificará al fiscal y se presentará cinco (5) días antes del juicio a menos que se demostrare la existencia de justa causa para no haberla presentado dentro de dicho término o que el acusado no le constaren los fundamentos para la supresión, o que la ilegalidad de la obtención de la evidencia surgiere de la prueba del fiscal.**

Regla 234 de Procedimiento Criminal, *supra.* (Énfasis suplido).

El Tribunal Supremo ha establecido que una solicitud de supresión de evidencia deberá exponer "los hechos precisos o las razones específicas que sostengan el fundamento o fundamentos en que se basa la moción de supresión presentada". *Pueblo v. Serrano Reyes, supra*; *Pueblo v. Blase Vázquez,* 148 DPR 618, 633 (1999); *Pueblo v. Maldonado, Rosa,* 135 DPR 563, 569 (1994).

Luego, el tribunal oirá la prueba y celebrará una vista evidenciaria ante un magistrado distinto al que atenderá el juicio, siempre y cuando haya mediado orden judicial y la parte promovente demuestre que existe una controversia sustancial de hechos que amerite la vista. Regla 234 de Procedimiento Criminal, *supra.* Si no se demuestra la existencia de esta controversia sustancial, no es necesaria la celebración de la vista para resolver la moción. *Pueblo v. Maldonado, Rosa,* supra, pág. 569.

La vista de supresión de evidencia no es el "acto del juicio" que contempla nuestro ordenamiento jurídico. *Pueblo v. Rivera Rivera*, 117 DPR 283, 289 (1986). No está en controversia la culpabilidad o inocencia del acusado. Lo único que tiene que determinarse es la legalidad o razonabilidad del registro realizado. *Íd*. Por tanto, el *quantum* de prueba requerido en una vista de supresión de evidencia es el de la preponderancia de la prueba. E. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, pág. 333.

Por último, es preciso destacar que, si bien la determinación de si una actuación gubernamental es razonable --y, por ende, válida-- dependerá de los hechos particulares de cada caso, la adjudicación de una moción de supresión de evidencia no es de naturaleza fáctica. Deberán aquilatarse las cuestiones de hecho, empero, el procedimiento bajo la Regla 234 de Procedimiento Criminal, *supra*, "se refiere a asuntos de derecho que hay que dirimir como paso previo a la admisibilidad de evidencia". *Pueblo v. Blase Vázquez*, supra, pág. 633.

### D. Instrucciones al Jurado

Las instrucciones al Jurado constituyen "el mecanismo procesal mediante el cual los miembros del Jurado toman conocimiento del derecho aplicable al caso". *Pueblo v. Rodríguez Vicente,* 173 DPR 292, 297 (2008). El Tribunal Supremo ha enfatizado que, para que el Jurado pueda desempeñar dicha función, "los miembros del mismo -que, de ordinario, son completamente legos en la materia- deben ser instruidos adecuadamente sobre el derecho aplicable por el magistrado que preside el proceso". *Pueblo v. Lorio Ormsby I*, 137 DPR 722, 727 (1994), citando a *Pueblo v. Bonilla Ortiz*, 123 DPR 434, 439 (1989). Ello asegura que el desenlace del proceso adversativo esté guiado por el derecho y los hechos. *Pueblo v. Rodríguez Vicente, supra,*

págs. 297-298. Como corolario, toda instrucción al jurado deberá ser balanceada, clara, directa y no repetitiva. *Pueblo v. Mattei Torres*, 121 DPR 600, 620 (1988).

En términos generales, el acusado tiene el derecho a que se informe al Jurado de todos los aspectos del Derecho que, según cualquier teoría razonable, pudieran ser pertinentes en las deliberaciones, aunque la prueba de la defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. Negrón Ayala*, 171 DPR 406, 414 (2007). Entre los distintos aspectos que deben incluirse en las instrucciones al Jurado se encuentran los elementos del delito imputado y, si la prueba así lo justifica, los elementos de los delitos inferiores al imputado o que estén comprendidos dentro de este. Además, el tribunal deberá hacer hincapié en que el Ministerio Fiscal tiene la obligación de establecer todos los elementos del delito, más allá de duda razonable. *Pueblo v. Rosario*, 160 DPR 592, 604-605 (2003).

La Regla 137 de Procedimiento Criminal, 34 LPRA Ap. II, R. 137, provee el mecanismo para que el Ministerio Público y la defensa soliciten instrucciones especiales al foro de instancia. Particularmente, la precitada regla dispone en lo pertinente:

> **Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones**, al terminar el desfile de la prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que estas informen al jurado. **Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales** antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. […]

*Íd.* (Énfasis suplido)

Así, pues, la precitada regla, *supra,* "impide que se alegue error en instrucciones no objetadas ni solicitadas". *Pueblo v. Velázquez Caraballo,* 110 DPR 369, 372 (1980). No obstante, "si las instrucciones que efectivamente transmitió el tribunal a los señores del jurado, o aquellas que omitió transmitir, 'lesionan derechos fundamentales del acusado', este en apelación puede levantarlo como error a pesar de no haberlas objetado oportunamente". [Citas omitidas]. *Pueblo v. Ortiz Martínez,* 116 DPR 139, 151 (1985). Ante una apelación impugnando las instrucciones impartidas a un Jurado, hay que considerar las instrucciones en conjunto para determinar su corrección o incorrección. *Pueblo v. Domenech Meléndez,* 98 DPR 64, 68 (1969).

El tribunal tiene que informar al Jurado de todos los aspectos del derecho, incluyendo los elementos esenciales de las defensas presentadas por el acusado, "bajo cualquier teoría razonable pudieran estar presente en las deliberaciones [...] aunque la prueba de la defensa sea débil, inconsistente o de dudosa credibilidad". *Pueblo* v. *Acevedo Estrada,* 150 DPR 84, 94-95 (2000).

Finalmente, el Tribunal Supremo ha sostenido reiteradamente que el uso del *Libro de Instrucciones al Jurado* constituye la mejor práctica, ya que le cobija una presunción de corrección y estas no pueden ser impugnadas en ausencia de una demostración real de que, en efecto, la instrucción es errónea. *Pueblo v. Ortiz González,* 111 DPR 408 (1981).

### E. La Prueba de Carácter

Como regla general, la "[e]videncia de carácter de una persona o de un rasgo de su carácter, no es admisible cuando se ofrece para probar que en una ocasión específica la persona actuó de conformidad con tal carácter [...]". Regla 404 de Evidencia, 32 LPRA Ap. VI, R. 404. Esta regla de exclusión de evidencia de carácter responde a la preocupación de que "el jurado sobreestime el valor

inferencial de la evidencia de carácter y termine por emitir un veredicto [...] más a base de su [carácter] que a base de la conducta probada en el juicio". E. Chiesa Aponte, *Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales*, 1998, Tomo I, pág. 53. Al interpretar la derogada Regla 20 de Evidencia, equivalente a la actual Regla 404, *supra*, el Tribunal Supremo de Puerto Rico expresó lo siguiente:

> La norma general de exclusión de la Regla 20 encuentra apoyo en el consenso generalizado de que este tipo de prueba engendra los siguientes peligros: que el jurado le adscriba un peso mayor del que realmente merece; que le desvíe su atención de los elementos centrales del caso; o que alargue innecesariamente un proceso.

*Pueblo v. Martínez Solís*, 128 DPR 135, 151 (1991).

Sin embargo, a modo de excepción, nuestro ordenamiento jurídico permite la presentación de prueba de carácter en ciertas circunstancias específicas.

En lo pertinente al caso que nos ocupa, la Regla 404(B), 32 LPRA Ap. VI, R. 404 (B), dispone como sigue:

> Regla 404. Evidencia de carácter no es admisible para probar conducta; excepciones; evidencia sobre la comisión de otros delitos
> [...]
>
> (B) Evidencia de conducta específica, incluyendo la comisión de otros delitos, daño civil u otros actos, no es admisible para probar la propensión a incurrir en ese tipo de conducta y con el propósito de inferir que se actuó de conformidad con tal propensión. Sin embargo, evidencia de tal conducta es admisible si es pertinente para otros propósitos, tales como prueba de motivo, oportunidad, intención, preparación, plan, conocimiento, identidad, ausencia de error o accidente o para establecer o refutar una defensa.
>
> Si la persona acusada lo solicita, el Ministerio Público deberá notificarle la naturaleza general de toda prueba que el Ministerio Público se proponga presentar bajo este inciso. La notificación deberá proveerse con suficiente antelación al juicio, pero el tribunal podrá permitir que la notificación se haga durante el juicio si el Ministerio Público demuestra justa causa para no haber provisto la información antes del juicio.

El profesor Chiesa nos explica que esta regla permite la presentación de lo que cataloga como "conducta no imputada". E. Chiesa Aponte, *op. cit.* pág. 83. En este tipo de casos lo importante es la pertinencia. Si la conducta no imputada se trae como prueba de intención, motivo o para probar cualquiera de los propósitos que la regla permite, entonces es admisible. E. Chiesa Aponte, *op. cit.* pág. 84. Es decir, cuando la conducta imputada se trae bajo unos de los fundamentos permitidos por la Regla 404 (B), *supra*, entonces la prueba queda fuera de la regla general de exclusión porque la intención de esta no es establecer la propensión de la persona acusada a cometer determinada conducta, sino que su propósito es el de establecer, por ejemplo, el motivo. E. Chiesa Aponte, *op. cit.* pág. 78.

No obstante, hay que tener presente que, aun en los casos en que determinada prueba resulte admisible al amparo de la Regla 404 (B), *supra*, el foro de instancia tiene discreción para excluirla, cuando entiende que el valor probatorio de esta queda subordinado ante el efecto perjudicial que esta podría tener; en particular, el riesgo de convicción sobre bases erróneas. E. Chiesa Aponte, *op. cit.* pág. 88.

### F. *El Delito de Conspiración*

El convenio entre dos o más personas para cometer cualquier delito grave y que, en tal acuerdo, han planificado la participación de cada uno, el tiempo y el lugar de los hechos, constituye delito de conspiración. Artículo 244 del Código Penal de 2012, 33 LPRA sec. 5334.

El Artículo 244 del Código Penal de 2012, 33 LPRA sec. 5334, define expresamente el delito de conspiración del siguiente modo:

> Constituye conspiración, el convenio o acuerdo, entre dos o más personas para cometer un delito.

Cuando el convenio tenga como propósito la comisión de un delito menos grave, se incurrirá en delito menos grave.

Si el convenio es para cometer un delito grave, serán sancionadas con pena de reclusión por un término fijo de tres (3) años.

Ningún convenio, excepto para cometer un delito grave contra alguna persona, o para cometer el delito de incendiar o escalar un edificio, constituye conspiración a no ser que concurra algún acto para llevarlo a cabo, por uno o más de los conspiradores.

Se impondrá pena con circunstancias agravantes, cuando uno de los conspiradores fuera funcionario del orden público y se aprovechara de su cargo para cometer el delito.

El delito de conspiración queda completo al momento en que los conspiradores ejecutan un acto ulterior al convenio. D. Nevárez Muñiz, *Código Penal de Puerto Rico*, San Juan, Instituto para el Desarrollo del Derecho Inc., 2012, pág. 349. Ello, excepto en los casos de conspiración para cometer un delito grave contra una persona. *Íd.* El acuerdo mismo de cometer el delito grave configura el tipo requerido para el delito de conspiración. *Íd.* El acuerdo entre dos o más personas que desemboca en una conspiración puede ser demostrado por el Estado a través de prueba de la conducta observada en los conspiradores por medio de evidencia circunstancial o directa. *Pueblo v. Arreche Holdun*, 114 DPR 99, 107–108 (1983).

Se trata de un delito que se comete con el propósito de evitar ser descubierto en la comisión de un delito o identificado, o para facilitar ocultarse, fugarse o evitar ser arrestado, luego de haber sido denunciado, arrestado o sentenciado por un delito. D. Nevárez Muñiz, *op. cit.*, pág. 361-362. Es un delito que tutela el interés que tiene la justicia de procesar a las personas que cometen delito en su jurisdicción y tipifica como delito cualquier intento de vulnerar o burlar esa capacidad que tiene el Estado. *Íd.*

La declaración realizada por un conspirador, durante el curso de la conspiración, es admisible en evidencia como excepción a la regla general que excluye la prueba de referencia. *Pueblo v. Echevarría Rodríguez I*, 128 DPR 299, 322 (1991).

## G. *El Delito de Asesinato*

De conformidad con lo expresamente estatuido en el Artículo 92 del Código Penal de 2012, el delito de asesinato se define como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5142. El elemento objetivo del delito de asesinato es dar muerte a un ser humano, mientras que el elemento subjetivo es cuando la persona actúa a propósito, con conocimiento o temerariamente. D. Nevares-Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, SITUM, 2019, pág. 149-150.

Asimismo, el Artículo 22 (1)(a) del Código Penal de 2012 señala que, "una persona actúa 'a propósito' cuando su objetivo consciente es la producción de dicho resultado". 33 LPRA sec. 5014(1)(a). A su vez, una persona actúa con conocimiento "cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta". Artículo 22 (2)(a) del Código Penal de 2012, 33 LPRA sec. 5014(2)(a).

Según la profesora Dora Nevárez-Muñiz, la Ley Núm. 246-2014, que enmendó el Código Penal de 2012, flexibilizó los requisitos para probar el asesinato en primer grado, puesto que se sustituyó el elemento de premeditación y deliberación por los elementos de "a propósito" o "con conocimiento". Nevares-Muñiz, *op. cit.*, págs. 153-155; Véase, además, F. M. Pacheco Camacho*, Enmiendas al Código Penal 2012: Cambios al Elemento de Intención Criminal,* 55 Rev. Der P.R. 41 (2015). En ese sentido, bajo el elemento de deliberación y premeditación se requería que el acto fuera pensado de antemano; es decir, que se llegara a la intención de matar luego de alguna

consideración. *Pueblo v. Concepción Guerra*, 194 DPR 291, 305 (2015). No obstante, no era necesario un intervalo de tiempo determinado entre la intención de matar y el acto de matar, por lo que el delito de asesinato en primer grado podía formarse sin la deliberación del acto. *Íd.* De este modo, con los elementos de "a propósito" o "con conocimiento", ya no es necesario probar la deliberación previa a la resolución de matar. Nevares-Muñiz, *op. cit.*; F. M. Pacheco Camacho, *supra*. Ante ello, se hace más comprensible la instrucción que se imparta al jurado sobre el elemento mental. *Íd.*

A fin de exponer los grados de asesinato reconocidos en nuestro ordenamiento penal, el Artículo 93 del Código Penal de 2012, 33 LPRA sec. 5142 (d), reza como sigue:

> Constituye asesinato en primer grado:
>
> (a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento.
>
> [...]

Cónsono con el precitado artículo, se considera que una persona actúa "a propósito" cuando "el objetivo consciente o finalidad de su conducta es llevar a cabo el resultado prohibido por ley [...] o cuando cree que la circunstancia existe". D. Nevares-Muñiz, *Código Penal de Puerto Rico*, Ed. 2015, Instituto para el Desarrollo del Derecho, Inc., San Juan, pág. 46. Por tanto, cuando el Estado sostiene que el acto se cometió "a propósito", deberá probar que la persona acusada conscientemente quería incurrir en la conducta, como el acto de apuntar o disparar un arma; o la persona acusada conscientemente quería causar el resultado, como el daño o la muerte de la víctima. *Íd.*

De otro lado, una persona actúa "con conocimiento" cuando "la existencia de la circunstancia o del resultado es una prácticamente segura [que] se refiere a una probabilidad muy alta". *Íd.* En ese sentido, si se imputa la comisión al amparo de esta

modalidad, el Estado tiene que establecer que la persona acusada era consciente de que el resultado o el daño se produciría. *Íd.*

Por otro lado, el asesinato atenuado es un delito menor incluido bajo la modalidad de asesinato en primer grado. E. L. Chiesa Aponte, *Derecho Procesal Penal*, 84 Rev. Jur. U.P.R. 665, 677 (2015). De acuerdo con el Artículo 95 del Código Penal de 2012, el asesinato atenuado se define del modo siguiente:

> Toda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, será sancionada con pena de reclusión por un término fijo de quince (15) años.

33 LPRA sec. 5144.

Surge del citado artículo que los elementos del delito son: (1) dar muerte a un ser humano (2) a propósito, con conocimiento o temerariamente. Nevares-Muñiz, *op. cit.*, págs. 160-161. Sin embargo, dicho articulado permite atenuar la pena "por razón de que la muerte es consecuencia de una súbita pendencia o de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable". *Íd.*, pág. 161.

### H. Tentativa

El Código Penal de 2012 define la tentativa en su Artículo 35, el cual dispone como sigue:

> Existe tentativa cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad.

33 LPRA sec. 5048.

Para que se configure la tentativa, el Código Penal de 2012 exige que: (1) se realice una acción u omisión; (2) que esta sea a propósito o con conocimiento y de forma inequívoca, es decir, que sin lugar a duda se cometerá el delito que no llegó hasta su estado

de consumación; (3) que debe constituir la fase inmediatamente anterior a la consumación del acto exigido por el tipo; y (4) un resultado que no se ha verificado o consumado por causas ajenas a la voluntad de la persona actora. Nevares-Muñiz, *op. cit.*, págs. 75-76; *Véase, además*, D. Nevares-Muñiz, *La Tentativa de Delito en el Código Penal de 2004: Figura de Convergencia*, 43 Rev. Jur. U.I.P.R. 371 (2009).

### I. *La disolución del Jurado*

La Regla 144 de Procedimiento Criminal, 32 LPRA Ap. II, R. 144, establece que, antes del veredicto, el tribunal podrá ordenar la disolución del Jurado en determinadas circunstancias. Particularmente, el inciso (d) de la referida regla contempla que "[s]i se hubiere cometido algún error o se hubiere incurrido en alguna irregularidad durante el proceso que, a juicio del tribunal, le impidiere al jurado rendir un veredicto justo e imparcial", el tribunal podrá ordenar la disolución del Jurado. *Íd.*

Según explica el profesor Chiesa, "[e]sta regla constituye el vehículo estatutario para hacer valer el derecho del acusado a la terminación del juicio cuando la continuación es incompatible con el concepto de 'jurado imparcial', componente esencial del derecho constitucional a juicio por jurado". E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, 1995, Editorial Forum, pág. 227.

Sobre el particular, el Tribunal Supremo ha resuelto lo siguiente:

> [C]omo norma general y en circunstancias ordinarias, una instrucción oportuna y específica al Jurado por parte del magistrado que preside los procedimientos puede subsanar el efecto perjudicial que sobre el Jurado pudiera tener la admisión errónea de evidencia o los comentarios impropios provenientes de un testigo de cargo o del representante del Ministerio Fiscal.

*Pueblo v. Robles González*, 125 DPR 750, 759-760 (1990).

De igual manera, la conducta impropia del fiscal durante su informe final no necesariamente amerita la disolución del Jurado, ya que usualmente bastará con que el tribunal amoneste al Ministerio Público e imparta instrucciones al Jurado para subsanar la irregularidad. Chiesa Aponte, *op. cit.*

### J. *Quantum de la prueba*

La Constitución de Puerto Rico garantiza a toda persona acusada de delito el derecho fundamental a la presunción de inocencia. Artículo II, Sec. 11, Const. ELA, LPRA, Tomo 1. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021); *Pueblo v. De Jesús Mercado*, 188 DPR 467, 475 (2013). Además, la Regla 304 de Evidencia, 32 LPRA Ap. VI, R. 304 (1), ha incorporado este imperativo constitucional. Asimismo, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, reitera el precitado derecho fundamental: "En todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. [...]".

A su vez, dicha norma constituye uno de los imperativos del debido proceso de ley al exigir que una persona acusada en un proceso criminal se presuma inocente, mientras no se demuestre lo contrario. *Pueblo v. Irizarry*, 156 DPR 780, 786 (2002); *Pueblo v. León Martínez*, 132 DPR 746, 764 (1993). Para rebatir tal presunción, nuestro ordenamiento jurídico requiere que el Estado establezca la culpabilidad de una persona imputada de delito, más allá de duda razonable. *Pueblo v. Arlequín Vélez,* 204 DPR 117, 146 (2020); *Pueblo v. Toro Martínez,* 200 DPR 834, 855-85 (2018); *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986). En otras palabras, se exige un *quantum* probatorio de más allá de duda razonable para controvertir la presunción de inocencia. *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).

El concepto de "duda razonable" implica necesariamente aquella que produce insatisfacción o intranquilidad en la conciencia del juzgador respecto a la evidencia presentada en el caso. *Pueblo v. Irizarry,* supra, pág. 788. Sobre este requisito, el Tribunal Supremo ha reiterado que:

> El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido [...] Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada". *Pueblo v. De Jesús Mercado, supra*, pág. 476, citando a *Pueblo v. Cabán Torres, supra.*

Por lo tanto, el *quantum* de más allá de duda razonable aplica para "cada uno de los elementos del delito, la conexión de estos con el acusado y la intención o negligencia de éste". *Íd., Pueblo v. Santiago,* supra. A su vez, se ha resuelto que:

> La determinación de que cierta prueba es suficiente para demostrar la culpabilidad del acusado más allá de duda razonable es una cuestión de raciocinio, producto de un análisis de todos los elementos de juicio del caso y no una mera duda especulativa o imaginaria.

*Pueblo v. De Jesús Mercado*, supra, págs. 475-476.

### K. La Deferencia al Jurado

El trato marcado por deferencia hacia las determinaciones de los jurados se remonta al siglo XVIII, cuando el derecho a juicio por jurado del *common law* inglés fue ratificado mediante la aprobación de la Sexta Enmienda de la Constitución de los Estados Unidos de América. Véase, *Peña-Rodríguez v. Colorado*, 580 US 206, 231 (2017). En Puerto Rico, el derecho a ser juzgado por un Jurado está consagrado en el Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico. Así también, se encuentra codificado estatutariamente en la Regla 111 de Procedimiento Criminal, 34 LPRA Ap. II, R. 111.

Este cuerpo, constituido de doce (12) personas de la comunidad, está encargado de recibir y evaluar la prueba presentada durante un juicio, y finalmente adjudicarla. Nuestro Tribunal Supremo describió de manera asertiva las funciones de este ensamblaje de juzgadores de la siguiente manera:

> La opción de un juicio ante un panel de jurados implica conferir a éstos la administración de la justicia, esto es la determinación final sobre culpabilidad. El Jurado, compuesto por una muestra representativa de la comunidad del acusado tiene como encomienda evaluar la prueba, recibir instrucciones sobre el derecho aplicable, deliberar en secreto y rendir un veredicto final. De entender el Jurado que el acusado incurrió en responsabilidad criminal por los hechos que se le imputan deberá determinar el delito específico o el grado del mismo, por el cual éste deberá responderle a la sociedad.

*Pueblo v. Echevarría Rodríguez I*, supra, págs. 337-338.

Nuestro Alto Foro ha sido consistente en que las determinaciones de un Jurado merecen y demandan credibilidad, siempre que no medie error manifiesto, pasión, perjuicio o parcialidad. *Pueblo v. Acevedo Estrada,* supra, págs. 98-99; *Pueblo v. Colón Castillo,* 140 DPR 564, 580 (1996); *Pueblo v. Rosario Reyes,* 138 DPR 591, 598 (1995); *Pueblo v. Rivera Robles,* 121 DPR 858, 869-870 (1988); *Pueblo v. Cabán Torres,* 117 DPR 645, 653-654 (1986). En ausencia de tales circunstancias, la jurisprudencia impide la intervención en apelación. *Íd.* Sobre la deferencia al Jurado, el Tribunal Supremo ha manifestado lo siguiente:

> El jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba. Son estos quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos.

*Pueblo v. Ruiz Ramos,* 125 DPR 365, 400-401 (1990), citando a *Pueblo v. Pellot Pérez,* 121 DPR 791 (1988). Véase, además, *Pueblo v. Rosario Reyes,* supra, págs. 598-599.

Ahora bien, esto no es sinónimo a infalibilidad. Ello tampoco implica que se hará caso omiso a los errores que haya cometido el foro de instancia en su evaluación. *Pueblo v. Pagán Díaz,* 111 DPR

608, 621 (1981). Después de todo, los tribunales apelativos, al igual que el tribunal sentenciador, tienen el derecho y el deber de "tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Acevedo Estrada*, supra, pág. 100. Un tribunal revisor puede intervenir en la apreciación de un jurado, que culmine en un fallo condenatorio, cuando una evaluación de la prueba produzca "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974).

A esto añadimos que, tanto nuestro Tribunal Supremo, como el marco normativo sobre el derecho probatorio, han reconocido que un hecho puede ser establecido con solo el testimonio de una persona. *Pueblo v. Toro Martínez*, supra, pág. 860; *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991); *Pueblo v. Acevedo Quiñones*, 100 DPR 894, 899 (1972). Así también, la Regla 110 (D) de Evidencia, 32 LPRA Ap. VI, R. 110(D), establece que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley".

Por tanto, las determinaciones del juzgador de los hechos no deben ser descartadas arbitrariamente, ni deben sustituirse por otro criterio, a menos que, de la prueba admitida, surja que no existe base suficiente para apoyarlas. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62 (1991). Es decir, que solo debemos apartarnos de esta deferencia cuando la apreciación de la prueba se alejó demasiado de la prueba presentada, o cuando la realidad no concuerda con la evidencia sometida durante el juicio, o esta resultare increíble o imposible. *Pueblo v. Acevedo Estrada*, supra, págs. 98-99.

**III**

Es la contención principal del apelante en su primer señalamiento de error que el foro primario incidió al denegar su moción de descubrimiento de prueba por tardía. Asimismo, argumentó que se le violó su derecho a un debido proceso de ley, toda vez que el Ministerio Publico no le entregó prueba que considera impugnatoria, exculpatoria, beneficiosa y pertinente a su alegada inocencia.

Sobre estos extremos, es preciso destacar que, en el caso que nos ocupa, el Acto de Lectura de acusación se celebró el 8 de abril de 2022, y ese día el foro primario entregó Orden de Manejo del Caso. A partir de esa fecha, el apelante tenía veinte (20) días para presentar una moción al amparo de la Regla 95 de Procedimiento Criminal, *supra,* relacionada con el descubrimiento de prueba**, mas no lo hizo**. Sobre este particular, surge del expediente que el Ministerio Público descubrió toda la prueba que tenía disponible hasta ese momento, por lo que cumplió con su deber continuo de informar. Incluso, surge que estuvo disponible en la Fiscalía de Mayagüez el 6 de diciembre de 2022 y el 12 de enero de 2023, para que la defensa del apelante examinara la evidencia física, pero no asistieron. Asimismo, el foro primario le advirtió al apelante que durante el juicio no podría alegar que solicitó evidencia y no se le entregó, debido a que el récord era claro sobre esos extremos.

Según adelantáramos, una vez culminó el descubrimiento de prueba, el juicio comenzó el 21 de junio de 2023, con el juramento del Jurado, la lectura de las acusaciones y las instrucciones preliminares. Sin embargo, el 28 de agosto de 2023, el apelante presentó ante el foro primario una *Moción Urgente en Solicitud de Orden al Amparo de la Regla 95 y de lo Resuelto en Pueblo* v. *Casanova, supra,* y *Pueblo v. Velázquez Colón, supra,* la cual fue denegada, por tardía.

Es menester resaltar que el juicio por jurado comenzó desde el momento en que se tomó el juramento definitivo al Jurado, lo que ocurrió en este caso el **21 de junio de 2023** y que el descubrimiento de prueba debe completarse por lo menos, diez (10) días antes del comienzo del juicio. Véase, *Pueblo v. Paonesa Arroyo*, supra. En este caso, es un hecho incontrovertido que el apelante presentó la solicitud de descubrimiento de prueba, tardíamente, aproximadamente dos (2) meses después de comenzado el juicio por Jurado. Así, en ausencia de causa justificada para dicha tardanza, y, considerando que el Ministerio Público actuó con diligencia durante el descubrimiento de prueba, concluimos que el foro primario no incurrió en el primer error señalado por el apelante.

Como segundo señalamiento de error, Llama Díaz sostuvo que el foro primario incidió al denegar su solicitud de separación de juicios. En ese sentido, es preciso recordar que, el **28 de agosto de 2023**, el apelante presentó una *Moción Urgente en Solicitud de Juicio por Separado y en Solicitud de Vista Argumentativa*. Sin embargo, precisa recalcar, tal y como reseñáramos en nuestra exposición del derecho aplicable que, de conformidad con la Regla 93 de Procedimiento Criminal, *supra,* la solicitud de separación de juicios debe presentarse al menos veinte (20) días antes de iniciar el juicio. Así, resalta el hecho de que, en el caso de epígrafe, el juicio por jurado comenzó **21 de junio de 2023**. Consecuentemente, es forzoso concluir que el TPI no erró al denegar dicha solicitud, tras concluir que su presentación fue tardía.

Como tercer señalamiento de error, Llama Díaz arguyó que el foro primario incidió al denegar su solicitud de supresión de evidencia. En síntesis, el apelante sostuvo que solicitó la supresión de la evidencia contenida en un CD con información extraída de su celular. Ello, puesto que, aunque dicha extracción fue obtenida mediante una Orden de Registro y Allanamiento emitida por un juez,

esta fue diligenciada fuera del término establecido. Igualmente, el apelante argumentó que la declaración jurada utilizada para obtener la referida orden incumplía con los requisitos mínimos de ley, por lo que es insuficiente y, consecuentemente, el registro es ilegal. Adujo, además, que el foro *a quo* erró al denegar su solicitud de supresión de evidencia, únicamente por haberse iniciado el juicio con la juramentación del Jurado, lo que representa una violación a su derecho a un debido proceso de ley.

Es preciso destacar que la Regla 234 de Procedimiento Criminal, *supra*, dispone expresamente que la moción de supresión se notificará al fiscal y se presentará cinco (5) días antes del juicio. Ello, a menos que se demostrare la existencia de justa causa para no haberla presentado dentro de dicho término, o que al acusado no le constaren los fundamentos para la supresión, o que la ilegalidad de la obtención surgiere de la prueba del fiscal. A esos fines, el Prof. Ernesto L. Chiesa sostiene que "le corresponde al acusado persuadir al tribunal de la presencia de una de las circunstancias bajo las cuales se permite la presentación tardía de la moción".[147]

En el caso que nos ocupa, Llama Díaz presentó la *Moción Solicitando la Supresión de la Evidencia,* el 30 de agosto de 2023 y en ella cuestionó la admisibilidad de toda la evidencia obtenida mediante una Orden de Registro y Allanamiento en su contra. En apretada síntesis, el apelante adujo que la orden aludida carecía de especificidad; que la información utilizada para fundamentarla era incorrecta y que su diligenciamiento ocurrió fuera del término establecido en las Reglas de Procedimiento Criminal, *supra.* Así, el apelante cuestionó que la prueba del Ministerio Público era producto de un registro ilegal. Evaluada la solicitud de supresión de

---

[147] E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Investigativa,* Ed, Situm, 2017, pág. 291.

evidencia, el 5 de septiembre de 2023, el foro primario la declaró No Ha Lugar.

Reiteramos que el juicio comenzó el 21 de junio de 2023, con la juramentación definitiva del Jurado. Sin embargo, el apelante presentó la moción de supresión de evidencia, una vez iniciado el juicio. Subrayamos que dicho proceder es contrario a lo establecido en la Regla 234 de Procedimiento Criminal, *supra*, la cual dispone expresamente que dicha moción debe presentarse, como mínimo, cinco (5) días antes del juicio, salvo que se configurara alguna de las excepciones establecidas en la aludida Regla 234, *supra*, lo cual no ocurrió en este caso.

De igual forma, es también la contención del apelante que la Orden de Registro y Allanamiento de su celular y la extracción de la información se basó en declaraciones falsas realizadas por el agente Acevedo Olivencia. Asimismo, que la referida Orden de Registro y Allanamiento autorizaba únicamente la extracción de fotos de la víctima, las cuales fueron enviadas desde el celular del apelante. Asimismo, el apelante sostuvo que dicha prueba fue obtenida ilegalmente, lo cual afectó su derecho a un juicio justo e imparcial. Por tanto, solicitó que estas se excluyeran y aseguró que los fundamentos de su petición surgieron durante el desfile de prueba.

Enfatizamos que el apelante presentó la solicitud de supresión de evidencia, una vez iniciado el juicio, específicamente al comenzar el desfile de prueba. Además, que el descubrimiento de prueba se completó aproximadamente seis (6) meses antes del inicio del juicio, periodo durante el cual el Ministerio Público entregó la referida Orden de Registro y Allanamiento, la extracción realizada al teléfono del apelante y el informe preparado por el agente Lasalle Vargas. Es decir, que la información que, según esbozó el apelante, invalida la extracción de la información del dispositivo, era conocida por este

*antes del juicio*, sin que hubiere presentado su reclamo oportunamente.

En cuanto al argumento del apelante, a los fines del término de diligenciamiento de la orden, esta era información previamente conocida por este, por lo que es forzoso concluir que realizó el planteamiento tardíamente. En ese sentido, resaltamos que la devolución de una orden diligenciada dentro del período establecido en las Reglas de Procedimiento Criminal, *supra*, es un deber ministerial que no invalida un registro efectuado mediante una orden válida expedida a esos efectos. Véase *Pueblo* v. *Alberti Santiago*, 138 DPR 357, 364 (1995).

Ante este escenario, en el cual el apelante no demostró la existencia de justa causa para omitir presentar la moción de supresión de evidencia oportunamente, tampoco demostró desconocer los fundamentos para la supresión, o que la ilegalidad de la obtención surgiera de la prueba presentada por el Ministerio Público. Sin lugar a duda, ello le habría permitido cuestionarla en ese momento. Consecuentemente, concluimos que no incidió el foro primario al denegar la moción de supresión de evidencia presentada por el apelante, pues, en efecto, resultó tardía.

Como cuarto señalamiento de error, el apelante expuso que el foro primario incidió al denegar su solicitud de desestimación de la acusación por el delito de conspiración. Como veremos a continuación, este error tampoco se cometió.

Como cuestión de umbral, precisa destacar que, en el contexto de una investigación que se realizaba, surgió que el agente Méndez Rodríguez había efectuado la extracción del celular de González González, del cual surgía una foto de Andrés Llama Díaz, un contacto con el nombre "Benny", así como videos que documentaban la vigilancia y seguimiento a la víctima. Como secuela de ello, el agente Acevedo Olivencia solicitó y obtuvo de la

extracción del celular de González González, información que era pertinente a la comisión del delito de conspiración.

A esos fines, el agente Acevedo Olivencia solicitó la Orden de Registro y Allanamiento del celular del apelante, la cual se sustentó en la declaración fundamentada que dicho agente prestó. De esta se desprende que el agente Acevedo Olivencia le informó al juez que González González le indicó que en su celular había una foto de la víctima, que le había sido enviada por el apelante días antes de los hechos, a los fines de identificarle. Además, su solicitud obedeció también a que existían imágenes, llamadas y mensajes de texto y voz entre el apelante y González González, relacionados con la planificación de los hechos. El periodo de fechas solicitado fue desde el 25 de julio hasta el 5 de agosto de 2021. Sobre el particular, resulta pertinente enfatizar que el apelante entregó voluntariamente su celular el 4 de noviembre de 2021 y que de allí surgió información relevante sobre cómo se ordenó, conspiró y planificó el asesinato de Andrés Llama Díaz.

Así las cosas, tras evaluar la declaración jurada del agente Acevedo Olivencia, el foro primario ordenó que se realizara una imagen digital forense del teléfono que el apelante entregó voluntariamente. En la aludida orden se autorizó la búsqueda para identificar al usuario del equipo que incluyó toda fotografía de Andrés Llama Díaz enviada desde el teléfono entre la fecha de 25 de julio al 5 de agosto de 2021, así como registros de llamadas, mensajes de texto, lista de contactos, galería de fotos y el Wi-Fi al que se conectó. Igualmente, se ordenó acceso al "*unllocated space*", que es la porción de memoria borrada a ser recuperada mediante trabajo forense. Se autorizó también la recuperación de cualquier data digital, documentos, imágenes y videos digitales que surgieran de la imagen forense para identificar al usuario del dispositivo. Se

realizó una extracción *Cellebrite* y así se lograron recuperar todos los archivos digitales correspondientes al periodo solicitado.

En el caso de epígrafe, el foro primario celebró una vista al amparo de la Regla 109, *supra*, para determinar la admisibilidad de la extracción del celular del apelante y, tras escuchar los testimonios de los agentes Acevedo Olivencia y Lasalle Vargas, concluyó que la extracción constituía evidencia admisible. Posteriormente, estos agentes declararon en el juicio sobre la orden y la extracción de la información, por lo que el Ministerio Público cumplió con los requisitos necesarios para la admisión de dicha prueba y la presunción de su validez no fue rebatida por la defensa del apelante. Sobre estos extremos, el agente Lasalle Vargas declaró que, en el caso del celular del apelante, no se realizó una extracción física, razón por la cual la ausencia de la foto de la víctima podría deberse a que no estaba en el dispositivo o a que fue eliminada por el usuario.

En lo pertinente, el Jurado tuvo igualmente la oportunidad de aquilatar el testimonio del testigo cooperador, González González. Sin embargo, el apelante arguyó que su *demeanor* fue altamente cuestionable. Consecuentemente, nos urge a sustituir el criterio del Jurado en la adjudicación de credibilidad a dicho testigo, a los fines de concluir que el foro primario incidió al denegar su solicitud de desestimación de la acusación, en cuanto al delito de conspiración. Es la contención principal del apelante que su convicción está basada en el testimonio no corroborado de un testigo mendaz, que además es un asesino confeso. Por tanto, considera que procede aquilatar en apelación el testimonio de González González, tomando en consideración dichos criterios. No tiene razón el apelante.

Con respecto a la apreciación de la prueba oral, resolvemos de forma cónsona con la norma de deferencia a la credibilidad del juzgador de los hechos, que en este caso es la institución del Jurado.

Ello, pues son estos quienes normalmente están en mejores condiciones de aquilatar la prueba, debido a que gozan de la oportunidad de ver y escuchar directamente a los testigos. *Pueblo v. Ruiz Ramos*, supra, págs. 400-401. Además, según el testimonio del agente Acevedo Olivencia, la evidencia en contra del apelante consistió de dicho testimonio, el cual fue corroborado con las fotos.[148]

En los señalamientos de error quinto, sexto y octavo formulados, el apelante argumentó que el foro primario incidió al declarar sin lugar la *Solicitud de Instrucciones Especiales al Jurado* y una Solicitud de Orden. En virtud de esta última, Llama Díaz solicitó que se entregara información pertinente a su inocencia, por entender que constituía prueba exculpatoria. En su octavo señalamiento de error, el apelante aludió específicamente a su petición de examinar el teléfono celular ocupado al testigo cooperador, del cual adujo que se extrajo información selectiva y limitada.

De un examen del expediente de autos surge que no se presentó demostración afirmativa alguna de que las declaraciones juradas de los agentes, así como sus testimonios, contuvieran prueba exculpatoria. En cuanto a lo referente a la extracción realizada al dispositivo de González González, el Ministerio Público contaba con la extracción de información específica solicitada por el agente Acevedo Olivencia, mas no con la extracción total del dispositivo de este testigo que se realizó en otro caso. No obstante, a solicitud del apelante, dicha extracción total relacionada al otro caso fue examinada en sala y se pudo corroborar que no contenía prueba exculpatoria. Cabe destacar que dicha extracción total había

---

[148] *Véase* págs. 186-187 de la TPO de la vista celebrada el 28 de septiembre de 2023.

sido entregada al apelante antes del testimonio de González González.

En el séptimo señalamiento de error formulado, el apelante planteó que el foro primario incidió al denegar su *Moción al Amparo de la Regla 404 de Evidencia*. En específico, razonó que el único testigo de los hechos es un coautor, cuyo testimonio debió examinarse con cautela. Consideró que ello ocasionó que el Jurado considerara prueba de carácter del apelante al momento de emitir su veredicto. El apelante esgrimió que dicha prueba es inadmisible y que ocasionó confusión en el Jurado, al permitir que dicho testigo se refiriera al apelante como "craquero". En fin, que la admisión de esta prueba causó perjuicio indebido. Así también, el apelante manifestó que los comentarios de su hermano, Andrés Llama Díaz, durante su testimonio, en el que aludió a actos específicos, debieron excluirse al amparo de la Regla 404 (b) de Evidencia, supra.

Como regla general, la prueba de carácter es inadmisible cuando se utiliza para probar propensión del acusado o para inferir que este actuó conforme a dicho carácter. Según mencionáramos, la Regla 404 de Evidencia, *supra*, dispone que la evidencia sobre conducta específica, la que incluye la comisión de otros delitos, es inadmisible para probar que el acusado tiene una propensión a incurrir en ese mismo tipo de conducta y para que se infiera que este actuó de acuerdo con esta propensión. La excepción a esta regla es que la evidencia de tal conducta sea pertinente para otros propósitos, tales como prueba de motivo, oportunidad, intención, preparación, plan, conocimiento, identidad, ausencia de error o accidente, o para establecer o refutar una defensa.

Sobre estos extremos, surge del testimonio de González González que este afirmó conocer al apelante, debido a que este último consumía *crack* y él se lo vendía. Destacó que la relación entre ellos comenzó en el 2018, cuando comenzó a entregarle drogas

a domicilio y que se comunicaba con este por télefono.[149]   Dicha información fue pertinente a los fines de establecer que el apelante y el testigo tenían una relación previa a los hechos del caso; que González González conocía la ubicación de la casa del apelante debido a las entregas de mercancía y que ambos contaban con los números telefónicos del otro para comunicarse. Esta información es relevante y no tuvo como objetivo demostrar propensión del apelante sino establecer el conocimiento personal que tenía del testigo, así como refutar la defensa del apelante de que no conocía a González González.

De igual forma, en su testimonio, Andrés Llama Díaz, víctima de los hechos por el cual fue juzgado y convicto el apelante, declaró que no tenía una buena relación con este, quien es su hermano, y que las comunicaciones entre ambos se relacionaban a peticiones de dinero que le hacía el apelante.[150] Andrés Llama Díaz declaró que habían sostenido varias discusiones que terminaron en amenazas del apelante si este no accedía a darle dinero y que se sintió amenazado y temió por su vida, particularmente desde que el testigo asumió la dirección de *Flan-es-Cedó,* lo que generó conflictos entre ambos.[151]

De lo anterior se desprende que el testimonio de Andrés Llama Díaz tuvo el propósito de demostrar la razón por la cual el apelante conspiró para ordenar su muerte y que no se presentó para establecer propensión alguna, sino únicamente motivo. Sobre el particular, enfatizamos que la excepción a la Regla 404 (b) de Evidencia, *supra,* fue debidamente notificada en la declaración jurada del testigo.

---

[149] *Véase* págs. 44-45 de la TPO de la vista celebrada el 11 de septiembre de 2023.
[150] *Véase* pág. 161 de la TPO de la vista celebrada el 7 de septiembre de 2023.
[151]  *Íd.,* pág. 162 de la TPO de la vista celebrada el 7 de septiembre de 2023.

A la luz de lo esbozado, concluimos que, en efecto, los comentarios que realizó Andrés Llama Díaz en su testimonio, no fueron dirigidos a probar propensión, sino únicamente motivo. Por todo lo anterior, concluimos, además, que ninguno de los testimonios a los que aludió el apelante, tenían como finalidad establecer propensión. Por tanto, el foro primario no incidió al admitirlos.

En su noveno señalamiento de error, el apelante adujo que el foro *a quo* incidió al sostener una convicción basada en el testimonio mendaz de un testigo cooperador, sin que este fuera corroborado. Asimismo, argumentó que, como consecuencia de ello, no se probó su culpabilidad más allá de duda razonable. Del mismo modo, aseguró que se le violó su derecho a la confrontación.

Respecto a este punto, reiteramos que es improcedente la invitación del apelante a que sustituyamos la adjudicación de credibilidad que el Jurado le atribuyó a dicho testimonio, el cual, además, fue corroborado por el agente Acevedo Olivencia durante su testimonio, así como con las fotos extraídas de los dispositivos. En cuanto a lo pertinente al derecho a la confrontación del apelante, es preciso destacar que este le fue garantizado mediante el contrainterrogatorio de la defensa a todos los testigos de cargo.

Como último señalamiento de error, Llama Díaz sostiene que el foro primario incidió al declarar sin lugar la solicitud de "*mistrial*" presentada por la defensa. Argumentó que el foro *a quo* tampoco tomó providencia alguna para determinar si el jurado había sido o no contaminado con publicidad excesiva, consistente en un video que el periódico Primera Hora publicó el mismo día en que se sometió el caso, el cual el jurado tuvo cuatro (4) días para ver.

Sobre este señalamiento de error, coincidimos con la postura del Pueblo en la que este concluye que las alegadas irregularidades señaladas por el apelante para fundamentar su solicitud de

disolución del Jurado -particularmente, la noticia publicada y el comentario del agente investigador referente a que otro acusado había levantado las manos- fueron, la primera especulativa y la segunda la respuesta a preguntas de la defensa. Por tanto, no constituyeron errores sustanciales; más bien, se limitaron a situaciones que fueron debidamente atendidas, mediante instrucciones específicas y oportunas al Jurado.

Sobre estos extremos, es preciso destacar que la mera exposición de los miembros del Jurado a la información publicada, de por sí, no descalifica a una persona para adjudicar la controversia. Nótese que una alegación de perjuicio indebido no puede basarse exclusivamente en la existencia de una noticia perjudicial, sino que debe sustentarse en el impacto real que dicha información tuvo sobre el Jurado. Véase, *Pueblo v. Rivera Nazario*, 141 DPR 865, 876 (1996). En el caso que nos ocupa el apelante no acreditó que el Jurado hubiese tenido acceso a la publicación aludida, por lo que es forzoso concluir que su razonamiento es especulativo.

En cuanto al incidente referente al comentario del agente investigador, a los efectos de que otro acusado había levantado las manos, primeramente, destacamos que ello obedeció a la respuesta de dicho testigo a las preguntas de la defensa. Asimismo, tampoco consideramos que constituyó un error sustancial. Además, recalcamos que la preocupación de la defensa del apelante fue debidamente atendida mediante instrucciones específicas y oportunas al Jurado. Véase *Pueblo v. Hernández Mercado*, 126 DPR 427,437-438 (1990).

Sobre estos extremos, surge de la página 47 de la TPO de la vista celebrada el 8 de septiembre de 2023 que, tras producirse las expresiones del agente Acevedo Olivencia en respuesta a las preguntas de la defensa, el foro primario advirtió a los miembros del

Jurado que las expresiones del testigo nada tenían que ver con el caso. De igual forma, instruyó al testigo a limitarse a contestar la pregunta con un sí o con un no. De este modo, concluimos que dicha instrucción oportuna al Jurado subsanó el error y evitó cualquier perjuicio indebido.

Por último, el apelante argumentó también que el incidente en el que su dispositivo electrónico se encendió y sonó en sala tuvo un efecto perjudicial para su defensa frente a los miembros del Jurado, ya que no existía razón alguna para se activara. Sobre el particular, puntualizamos que, en el momento en que el dispositivo electrónico se activó, el foro primario interrumpió el desfile de prueba e instruyó al Jurado respecto a que dicho dispositivo era una condición de la fianza y que nada tenía que ver con el proceso. En consecuencia, les advirtió que podría atribuirse a un olvido del Programa, en lo referente al horario.[152]

El Artículo 92 del Código Penal define "asesinato" como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA sec. 5141. A su vez, el Artículo 93 (a) del Código Penal establece que constituye asesinato en primer grado "[t]odo asesinato perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, o a propósito o con conocimiento". 33 LPRA sec. 5142. En este caso, la tentativa de asesinato se probó más allá de duda razonable.

Igualmente, el Artículo 244 del Código Penal, 33 LPRA sec. 5334, dispone que "[c]onstituye conspiración, el convenio o acuerdo, entre dos o más personas para cometer un delito y han formulado planes precisos respecto a la participación de cada cual, el tiempo y el lugar de los hechos". Como resultado de la prueba oral desfilada y creída por el Jurado, este determinó que no existía duda razonable

---

[152] *Véase* pág. 175 de la TPO de la vista celebrada el 8 de septiembre de 2023.

respecto a la culpabilidad del apelante. Asimismo, consideró que no existían dudas respecto a que concurrieron los elementos de los delitos de conspiración y tentativa de asesinato en primer grado. Por todo lo cual, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, no intervendremos con su apreciación de la prueba. Ello, toda vez que el Ministerio Público probó, más allá de duda razonable, tanto el delito de conspiración, como la tentativa de asesinato y las violaciones a la Ley Núm. 168-2019.

Así, evaluado el recurso y la prueba que obra en autos, y la norma anteriormente esbozada, justipreciamos que los errores señalados por el apelante no se cometieron. Procede confirmar el dictamen impugnado.

**IV**

Por los fundamentos anteriormente expuestos, confirmamos la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones